

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-17-1999

# ACLU NJ v. Schundler

Precedential or Non-Precedential:

Docket 98-5021

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"ACLU NJ v. Schundler" (1999). *1999 Decisions.* Paper 42.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/42

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed February 16, 1999
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 98-5021
_____

AMERICAN CIVIL LIBERTIES UNION OF NEW JERSEY, on
behalf of its members, ROBERT LANDER, ADAM JACOBS,
JOEL SOLOW and ANN SORREL

v.

BRET SCHUNDLER, in his official capacity as Mayor of the
City of Jersey City, New Jersey; THE CITY COUNCIL OF
JERSEY CITY, NEW JERSEY; CITY OF JERSEY CITY,
NEW JERSEY,

Appellants
_____

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

(D.C. No. 95-cv-00206)
(District Judge:  Honorable Dickinson R. Debevoise)
_____

Argued:  August 6, 1998

Before:  NYGAARD, ALITO, and RENDELL,
Circuit Judges

(Opinion Filed: February 16, 1999)

KEVIN J. HASSON (ARGUED)
ERIC W. TREENE
The Becket Fund for Religious Liberty
2000 Pennsylvania Ave., N.W.
  Suite 3580
Washington, D.C.  20006

Counsel for Appellants

NATHAN   LEWIN
RICHARD W. GARNETT (ARGUED)
MILLER, CASSIDY, LARROCA &
   LEWIN
2555 M Street, N.W.
Washington, D.C.  20037

Counsel for Chabad of Pittsburgh as
Amicus Curiae in Support of
Defendants-Appellants

RONALD K. CHEN (ARGUED)
RUTGERS CONSTITUTIONAL
    LITIGATION CLINIC
Rutgers Law School
15 Washington St.
Newark, NJ 07102

Counsel for Appellee

_____


OPINION OF THE COURT
_____


ALITO, Circuit Judge:


This appeal concerns the constitutionality of two Jersey City "holiday" displays. The first, which featured a menorah and a Christmas tree, was annually placed in front of City

2


Hall for several decades.  In 1995, the District Court permanently enjoined the City from continuing the practice of erecting this or any substantially similar display, see ACLU of N.J. v. Schundler, 931 F.Supp. 1180 (D.N.J. 1995), and a prior panel of our court affirmed that decision.  ACLU of N.J. v. Schundler, 104 F.3d 1435, 1444-50 (1997).  Jersey City subsequently moved for relief from that order under Rule 60 (b)(5) of the Federal Rules of Civil Procedure, contending that the Supreme Court's intervening decision in Agostini v. Felton, 521 U.S. 203, 117 S. Ct. 1997 (1997),  had undermined the panel's reasoning.  The District Court denied this motion, and we now affirm that decision.

Jersey City also challenges the District Court's most recent decision regarding a modified holiday display that the City put up after the original display was enjoined.  The modified

display contained not only a creche, a menorah, and Christmas tree, but also large plastic figures of Santa Claus and Frosty the Snowman, a red sled, and Kwanzaa symbols on the tree.  In addition, the display contained two signs stating that the display was one of a series of displays put up by the City throughout the year to celebrate its residents' cultural and ethnic diversity.   We find this modified display to be indistinguishable in any constitutionally significant respect from the displays upheld by the Supreme Court in Lynch v. Donnelly, 465 U.S. 668 (1984), and County of Allegheny v. Greater Pittsburgh ACLU, 492 U.S. 573 (1989) (hereinafter "Allegheny County"), and we therefore hold that Jersey City's modified display is likewise constitutional.

I.

From at least 1965 until 1995, the City of Jersey City commemorated the winter holiday season by displaying a creche and a menorah on city property in front of City Hall.  The creche and menorah were owned, maintained, and stored by the City.  The creche, which was displayed during the period preceding and following Christmas, included a manger that measured 11' 9" by 7' by 4' 4".  It also included figures of Mary, Joseph, the Baby Jesus, and the Three Wise Men;

these varied in height from 12" to 27".  Surrounded by a post-rail fence, the creche was placed on the right side of City Hall.  The menorah, measuring 19' by 14', was displayed during Chanukah on the left side of City Hall.  (Also on the left-side of the lawn was a 13' Christmas tree, but this apparently escaped the District Court's attention.1)  Because the date of Chanukah generally falls near that of Christmas, the creche and menorah were usually displayed simultaneously, but in 1994, when the plaintiffs commenced this suit, Chanukah began unusually early, on November 28, and therefore the menorah was taken down shortly before the creche went up.2

When Jersey City erected its traditional display in 1994, the American Civil Liberties Union sent the City a letter asking it to discontinue its practice of displaying religious symbols on public property.  In response, the City placed a sign adjacent to the display stating: "Through this display and others throughout the year, the City of Jersey City is pleased to celebrate the diverse cultural and ethnic heritages of its peoples."   Jersey City maintains that the sign's reference to other events refers to, among other things, the City's annual commemoration of Ramadan, the annual Grand Phagwah Parade held to celebrate the Hindu New Year, and a wide variety of cultural events related to the many diverse

ethnic groups in the City.

On December 21, 1994, the ACLU and other plaintiffs filed a complaint in state court against the City, the mayor, and the city council (hereinafter collectively "the City"), challenging the City's display under the federal and state constitutions.3  In January 1995, the City removed the action to the District Court, and on November 28, 1995, the District

_____

1. See 104 F.3d at 1438 n.1.
2. According to the City, such an anomaly will not recur until 2014.
3. Neither side has argued in this appeal that the state constitution imposes tighter restrictions than the federal Constitution.  Therefore, for purposes of this litigation we treat the two bodies of law as coextensive. See ACLU of N.J. v. Schundler, 104 F.3d at 1446 n.11.

4

Court granted the plaintiffs' motion for summary judgment and held that the City's display violated the Establishment Clause of the federal Constitution, as well as a parallel state constitutional provision.  The District Court permanently enjoined the City from erecting its traditional display or any substantially similar scene or display at the front entrance of City Hall or on other property that the City owned, maintained, or controlled.

The City announced that it would appeal the decision, but in the meantime, on December 13, 1995, it erected a modified display that included, in addition to the elements in the previous display, a 4' tall plastic figure of Santa Claus, a 3' 10" tall plastic figure of Frosty the Snowman, a 4' tall sled, Kwanzaa symbols on the tree, and two signs, each approximately 2' by 3', stating: "Through this display and others throughout the year, the City of Jersey City is pleased to celebrate the diverse cultural and ethnic heritages of its peoples."  See Appendix A (display on left side of City Hall); Appendix B (display on right side of City Hall); Appendix C (map of display).

The plaintiffs then moved to have the City held in contempt of the District Court's injunction, and they also sought a preliminary injunction against the modified display.  On December 18, the District Court denied these requests, concluding that the addition of the secular symbols rendered the modified display constitutionally unobjectionable.  Ruling

quickly, the District Court did not analyze the modified display at length but wrote:

> I conclude that by making these additions defendants have sufficiently demystified the [holy], they have sufficiently desanctified sacred symbols, and they have sufficiently deconsecrated the sacred to escape the confines of the injunctive order in this case.

On appeal, a panel of our court affirmed the District Court's decision regarding the original display. 104 F.3d at 1444–50. The panel noted the religious significance of the creche and the menorah, as well as the City's annual

expenditure of some public funds to erect and maintain the display. Id. at 1445. The panel concluded that "the [original] display cannot be viewed as anything but a constitutionally impermissible dual endorsement of Christianity and Judaism." 104 F.3d at 1446.

The panel cited three reasons for rejecting the City's argument that the display was not an endorsement of Christianity and Judaism but part of the City's year–long celebration of its people's many different religious and ethnic backgrounds. 104 F.3d at 1446–50. The panel concluded (a) that government endorsement of many different religions violated the Establishment Clause, id. at 1447, (b) that a reasonable observer, viewing the holiday display, would not be aware of the City's other religious and cultural celebrations at other times of the year, id. at 1447–49, and (c) that the City's policy of celebrating many different religions was a quintessential example of government entanglement with religion. Id. at 1449–50. In reaching the latter conclusion regarding entanglement, the prior panel relied chiefly on Aguilar v. Felton, 473 U.S. 402 (1985). See 104 F.3d at 1449–50.

Turning to the modified display, the panel held that the District Court's analysis was incorrect. 104 F.3d at 1450–52. The panel found no basis in Supreme Court cases for what it termed the District Court's "`demystification' approach," and the panel noted that the parties agreed that this approach was "flawed." Id. at 1450–51 & nn. 17–18. The panel "conclude[d] that the district court erred in determining that the constitutionality of the modified display depended on whether the presence of Frosty and Santa `demystified' the creche and the menorah." Id. at 1451 (footnote omitted). The panel therefore remanded the case for the District Court to analyze the modified display pursuant to the proper standards. Id. at 1452. But while remanding the question of the constitutionality of the modified display for

reconsideration by the District Court, the panel also spent several paragraphs expressing in dicta a skeptical view about the constitutionality of the modified display.   Id. at 1451-52.

On remand, the plaintiffs moved for summary judgment and a permanent injunction barring the modified display. The defendants cross-moved for summary judgment and also filed a motion under Fed. R. Civ. P. 60(b)(5) for relief from the District Court's earlier injunction on the ground that the Supreme Court's decision in Agostini, which overruled Aguilar, had undermined the panel's reasoning.  Specifically, the defendants pointed to the panel's reliance on the concept of "entanglement" and the Supreme Court's decision in Agostini that entanglement should no longer to be considered an independent test but should be viewed along with other factors as "an aspect of the inquiry into . . . effect." 117 S. Ct. at 2015.

Reversing its prior position, the District Court granted summary judgment for the plaintiffs and held that the modified display violated the Constitution.  The Court wrote that the panel's "discussion of the context of the display after the addition of Frosty the Snowman, Santa and a red sled leaves little doubt that it would conclude on the basis of the facts in the record before it that even after these additions the display communicates the City's endorsement of Christianity and Judaism in violation of the Establishment Clause."  The District Court also denied the defendants' motion for Rule 60(b)(5) relief, and the defendants then took this appeal.

II.

We first consider the City's challenge to the denial of its Rule 60(b)(5) motion.  Under that rule, a court may relieve a party from a final judgment or order when "it is no longer equitable that the judgment should have prospective application."  Fed. R. Civ. P. 60(b)(5).  A party can show that a judgment should no longer have prospective application if it can demonstrate "a significant change in either factual conditions or the law."  Rufo v. Inmantes of Suffolk County Jail, 502 U.S. 367, 384 (1992).

In Agostini, the Supreme Court modified the Establishment Clause test articulated in Lemon v. Kurtzman, 403 U.S. 602, 612-13 (1971), which asked (1) whether a challenged

government practice had a secular purpose, (2) whether its principal or primary effect advanced or inhibited religion, and

(3) whether it created an excessive entanglement of the government with religion.  See ACLU of N.J. v. Black Horse Pike Reg'l Bd. of Educ., 84 F.3d 1471, 1483 (3d Cir. 1996). The Agostini Court stated that Lemon's entanglement prong is best understood and treated "as an aspect of the inquiry into a statute's effect."  Agostini, 117 S. Ct. at 2015.  While this statement merges the entanglement prong with the effect prong, it does not mean that considerations of excessive entanglement have been entirely deleted from Establishment Clause analysis; in Agostini, the Court analyzed the factors regarding entanglement at length.  See id. at 2015-16. Rather, the statement appears to mean that entanglement, standing alone, will not render an action unconstitutional if the action does not have the overall effect of advancing, endorsing, or disapproving of religion.  See id.

Since entanglement analysis is still part of the Establishment Clause inquiry, the mere fact that the prongs have been merged is insufficient to undermine the prior panel's decision regarding the original Jersey City display. The City and amicus curiae Chabad of Pittsburgh point out, however, that the prior panel's entanglement analysis relied on two rationales that the Supreme Court rejected in Agostini.  First, the prior panel stated that the City's display policy would foster excessive interactions between municipal officials and local religious leaders in implementing the policy.4  104 F.3d at 1449-50.  Second, the prior panel reasoned that the City's displays would "produce political divisiveness."  Id. at 1450.  The Agostini Court addressed

_____

4. The panel asked: "Should a rabbi and a priest be consulted when erecting the menorah and the creche?  Should a ceremony accompany the erection of these religious symbols?  Should the City employ a Muslim cleric during the Ramadan Observance month to avoid offending a theological protocol of Islam?"  104 F.3d at 1449 (footnote omitted). Compare Greater Pittsburgh ACLU v. Allegheny County, 842 F.2d 655, 662 (3d Cir. 1988) ("mere placement and storage [of religious display] will involve little entanglement"), aff'd in part and rev'd in part, 492 U.S. 573 (1989).

these same two factors in considering the constitutionality of New York City's "Title I" program,5 under which public school teachers are sent into parochial schools to provide remedial education to disadvantaged children, and the Court held that these two factors "are insufficient by themselves to create an `excessive' entanglement" under its "current understanding of the Establishment Clause."  117 S. Ct. at 2015.

While we are inclined to agree with the City and amicus

curiae Chabad of Pittsburgh that the prior panel's entanglement analysis is no longer valid in the wake of Agostini, it does not follow that Rule 60(b)(5) relief was required.  Before discussing entanglement at all, the prior panel concluded that Jersey City's original display violated the Establishment Clause because it  "communicate[d] [an] endorsement of Christianity and Judaism . . . ." 104 F.3d at 1446.  If this conclusion is accepted, the original display is unconstitutional irrespective of the presence or absence of excessive entanglement.  Accordingly, we agree with the District Court that Rule 60(b)(5) relief was not required.

III.

We therefore turn to the question of the modified display. As noted, the District Court, after initially upholding this display, reached the opposite conclusion on remand.  Not unreasonably, the District Court interpreted certain statements in the prior panel opinion to mean that the panel viewed the modified display as constitutionally dubious.  We conclude, however, that the statements on which the District Court relied were merely dicta, that the prior panel did not render a decision regarding the constitutionality of the modified display, and that we are therefore obligated to analyze that question in accordance with our own best independent judgment.6

_____

5. Title I of the Elementary and Secondary Education Act of 1965, 79 Stat. 27 (1965), as modified, 20 U.S.C. S 6301 et seq. (1994).
6. Our court strives to maintain a consistent body of circuit jurisprudence. Thus, "[i]t is the tradition of this court that the holding of a panel in a reported opinion is binding on subsequent panels" and that "no subsequent panel overrules the holding in a published opinion of a previous panel."  Internal Operating Procedure 9.1 (emphasis added). Dicta in prior opinions, however, are not treated similarly.  On the contrary, we have repeatedly held that dicta are not binding.  See, e.g., McGurl v. Trucking Employees, 124 F.3d 471, 484 (3d Cir. 1997); United States v. Bennett, 100 F.3d 1105, 1110 (3d Cir. 1996); Bradley v. Pittsburgh Bd. of Educ., 913 F.2d 1064, 1071 (3d Cir. 1990). Our tradition of treating prior panel decisions as binding is closely tied to the rules and procedures regarding rehearing en banc.  Rehearing en banc provides the opportunity for the full court to correct a panel decision to which the

9

As previously noted, when the modified display was first challenged in the District Court, that Court was required to rule on an expedited basis, and the Court was therefore unable to provide a lengthy, detailed explanation of its

conclusion that the display satisfied Establishment Clause
standards.  Instead, the District Court summarily stated that
by adding additional objects to the original display, the City
had, in the Court's view, "sufficiently demystified the [holy],
. . . sufficiently desanctified sacred symbols, and . . .
sufficiently deconsecrated the sacred."  As both sides
recognized in the prior appeal and as the panel held, see 104
F.3d at 1451 & n.18, this analysis did not comport with
Lynch or Allegheny County and finds no support in
Establishment Clause jurisprudence.  Demystification,
desanctification, and deconsecration suggest a process of
profanation, something that the Establishment Clause
neither demands nor tolerates.  See, e.g., Lemon, 403 U.S. at
612 (government conduct violates Establishment Clause if its
primary effect is to advance or inhibit religion).

_____

court is unwilling to be bound.  But the standards for rehearing
en banc look to the panel's decision, not to the panel's dicta.
See  Fed. R. App. P. 35 (emphasis added) (rehearing in banc may
be ordered by a court of appeals "to secure or maintain uniformity
of its decisions . . . .").  LAR 35.1 (emphasis added) (if rehearing
is sought based on an asserted conflict with prior circuit precedent,
counsel must certify, "based on a reasoned and studied professional
judgment, the panel decision is contrary to decisions of the United
States Court of Appeals for the Third Circuit . . . and that
consideration by the full court is necessary to secure and maintain
uniformity of decisions in this court.").  Thus, panel dicta are
generally not tested by the availability of en banc review, and
they are accordingly not entitled to the same binding authority
that our court has traditionally given to panel decisions.

10

Emphasizing the insufficiency of the District Court's
"demystification" analysis, the prior panel  "conclude[d] that
the district court erred in determining that the
constitutionality of the modified display depended on whether
the presence of Frosty and Santa `demystified' the creche and
the menorah."  104 F.3d at 1451.  The panel therefore
vacated the District Court's modified injunction order and
remanded the case "so that the district court [could] consider,
consistent with the standards set forth in [its] opinion,
whether the modified display was constitutional."  Id. at
1452.  Since no facts were in dispute, the prior panel itself
certainly could have ruled on the constitutionality of the
modified display.  Moreover, since the relevant facts are
relatively simple and were set out in full detail in the panel's
opinion, see id. at 1437–38, the prior panel was in just as
good a position as the District Court to decide that question
in the first instance. Yet the prior panel chose not to take
that course, instead remanding for the District Court to make

that decision.  In light of this remand, it is apparent that the prior panel did not foreclose us from ruling on the constitutionality of the modified display in accordance with our own best independent judgment.  We entirely agree with Judge McKee's summary of the majority holding.  In concurrence, Judge McKee wrote:

> I think my colleagues' analysis of Lynch and Allegheny establishes that the first display is inconsistent with the prohibitions of Lemon and properly remands to determine the legality of the second display.

104 F.3d at 1453 (emphasis added).

We thus reject the plaintiffs' suggestion that the prior panel "formally remanded the issue of the Modified Display to the district court" but "in effect already answered the question it ostensibly remanded."  Appellees' Br. at 6, 8 (emphasis added).  There is no such thing as an ostensible remand, and that is not what the prior panel purported to do.  The prior panel in fact remanded the question of the constitutionality of the modified display, thus leaving the question open and

11

requiring us to decide that question for ourselves.

For these reasons, the dissent's chastisements about "evad[ing] the reasoning of [the] prior panel" (Dissent at 42) are mistaken.  We have scrupulously followed what is "binding" upon us:  the prior panel's "holding" (see IOP 9.1), i.e., that the original display was unconstitutional and the District Court, in judging the second display, employed incorrect standards.  As for the prior panel's comments about the modified display, the dissent itself acknowledges that these were expressed "in dictum" (Dissent at 42), but the dissent would apparently have us follow these non-binding statements rather than Supreme Court precedent, viz., Lynch and Allegheny County.  This we cannot do.

IV.

The Supreme Court has handed down two decisions concerning the constitutionality of municipal holiday displays, and therefore it is to these decisions that we must primarily look for guidance in evaluating Jersey City's modified display.

A.  In Lynch v. Donnelly, 465 U.S. 668 (1984), the Court upheld the constitutionality of a holiday display erected by the City of Pawtucket, Rhode Island.  "[S]ituated in a park owned by a nonprofit organization and located in the heart of the shopping district," the display was characterized by the

Court as "essentially like those to be found in hundreds of
towns or cities across the Nation -- often on public grounds
-- during the Christmas season." Id. at 671. The display
consisted of "many of the figures and decorations
traditionally associated with Christmas, including, among
other things, a Santa Claus house, reindeer pulling Santa's
sleigh, candy-striped poles, a Christmas tree, carolers, cutout
figures representing such characters as a clown, an elephant,
and a teddy bear, hundreds of colored lights, a large banner
that reads `SEASONS GREETINGS,' and [a] creche." Id. All
components of the display were owned by the City. Id. The
City had purchased the creche some years earlier for $1365,
and the City incurred a small annual expense in erecting,

12

lighting, and dismantling the creche. Id.

Writing for the Court, Chief Justice Burger analyzed the
inclusion of the creche in the Pawtucket display under the
Lemon test and thus inquired whether the inclusion of the
creche had a secular purpose, whether its principal or
primary purpose was to advance or inhibit religion, and
whether it created an excessive entanglement of government
with religion. See 465 U.S. at 679. The Court held that the
Pawtucket display had a secular purpose, explaining:

> The city . . . has principally taken note of a significant
> historical religious event long celebrated in the Western
> World. The creche in the display depicts the historical
> origins of the traditional event long recognized as a
> National Holiday. . . . The display is sponsored by the
> City to celebrate the Holiday and to depict the origins of
> that Holiday. These are legitimate secular purposes.

Id. at 680-81 (footnote omitted).

The Court likewise held that the inclusion of the creche did
not have the principal or primary effect of advancing religion.
465 U.S. at 681-83. Noting that prior Establishment Clause
cases had upheld various forms of aid to students attending
church-related schools and colleges, tax exemptions for
church property, Sunday Closing laws, "release time"
programs, and legislative prayers, the Court was "unable to
discern a greater aid to religion deriving from inclusion of the
creche than from these benefits and endorsements previously
held not violative of the Establishment Clause." Id. at 682.
The Court concluded that if the inclusion of the creche
provided some "benefit to one faith or religion or to all
religions," the effect was "indirect, remote and incidental." Id.
at 683.

Finally, the Court held that there was no impermissible

entanglement. 465 U.S. at 683-85. The Court saw no "administrative entanglement" and observed that there was "no evidence of contact with church authorities concerning the content or design of the exhibit." Id. at 684. The Court

also noted that the cost of including the creche was small. Nor did the Court see a basis for finding an excessive entanglement due to political divisiveness. Id. at 684-85. The Court rejected the idea that political divisiveness alone could "serve to invalidate otherwise permissible conduct." Id. at 684. Observing that the inclusion of the creche had produced no marked dissension prior to the lawsuit then before it, the Court pointedly wrote that "[a] litigant cannot, by the very act of commencing a lawsuit . . . create the appearance of divisiveness and then exploit it as evidence of entanglement." Id. at 684-85.[7]

Justice O'Connor, who joined the opinion of the Court and cast the critical fifth vote in favor of the constitutionality of the Pawtucket display, wrote a concurring opinion "to suggest a clarification of . . . Establishment Clause doctrine." Id. at 687 (O'Connor, J., concurring). She pointed out, however, that she viewed the Court's opinion as "consistent with" her analysis. Id.

Justice O'Connor wrote that government "can run afoul of [the Establishment Clause] in two principal ways": by means of an "excessive entanglement with religious institutions" and by "government endorsement or disapproval of religion." 465 U.S. at 687-88. In the Pawtucket case, Justice O'Connor found "no institutional entanglement," and she stated that "political divisiveness along religious lines should not be an independent test of constitutionality." Id. at 689. "The central issue in [the] case," she stated, was "whether Pawtucket ha[d] endorsed Christianity by its display of the creche." Id. at 690. "To answer that question," she continued, it was necessary to "examine both what Pawtucket intended to communicate in displaying the creche and what message the city's display actually conveyed." Id. She found that "Pawtucket did not intend to convey any message of endorsement of Christianity or disapproval of non-Christian religions." Id. at 691. She explained:

_____

7. See ACLU of N.J. v. Black Horse Pike Reg'l Bd. of Educ., 84 F.3d 1471, 1486 (3d Cir. 1996) (general summary of Lynch).

> The evident purpose of including the creche in the
> larger display was not promotion of the religious
> content of the creche but celebration of the public
> holiday through its traditional symbols.  Celebration
> of public holidays, which have cultural significance
> even if they also have religious aspects, is a
> legitimate secular purpose.

Id.

Justice O'Connor also concluded that Pawtucket's display
of the creche did not "communicate a message that the
government intend[ed] to endorse the Christian beliefs
represented by the creche."  Id. at 692.  She wrote:

> Although the religious and indeed sectarian significance
> of the creche . . . is not neutralized by the setting, the
> overall holiday setting changes what viewers may fairly
> understand to be the purpose of the display -- as a
> typical museum setting, though not neutralizing the
> religious content of a religious painting, negates any
> message of endorsement of that content.  The display
> celebrates a public holiday, and no one contends that
> declaration of that holiday is understood to be an
> endorsement of religion.  The holiday itself  has very
> strong secular components and traditions.  Government
> celebration of the holiday, which is extremely common,
> generally is not understood to endorse the religious
> content of the holiday, just as government celebration of
> Thanksgiving is not so understood.  The creche is a
> traditional symbol of the holiday that is very commonly
> displayed along with purely secular symbols, as it was in
> Pawtucket.

Id.

Four Justices -- Justices Brennan, Marshall, Blackmun,
and Stevens -- dissented, concluding that the Pawtucket
display did not have a secular purpose, 465 U.S. at 698-701
(Brennan, J., dissenting), had the primary effect of placing
"the government's imprimatur of approval on the particular

15

religious beliefs exemplified by the creche," id. at 701, and
"pose[d] a significant threat of fostering `excessive
entanglement.'" Id. at 702.

B.  The Supreme Court's second decision concerning
holiday displays came five years later in County of Allegheny
v. Greater Pittsburgh ACLU, 492 U.S. 573 (1989), aff'g in part
and rev'g in part, Greater Pittsburgh ACLU v. Allegheny
County, 842 F.2d 655 (3d Cir. 1988).  At issue were two

displays on public property in downtown Pittsburgh. The
first was situated on the Grand Staircase of the Allegheny
County Courthouse, a spot described as the "most public"
and "most beautiful" part of that building. 492 U.S. at 579.
This display consisted of a creche, a banner proclaiming
"Gloria in Excelsis Deo!" ("Glory to God in the highest!"), some
poinsettias, a "small" decorated evergreen, and a plaque
stating that the display had been donated by the Holy Name
Society, a Roman Catholic group. Id. at 580. "No figures of
Santa Claus or other decorations appeared on the Grand
Staircase." Id. at 580-81. (A picture of this display appears
at 492 U.S. at 622, Appendix A.)

Five Justices -- the four Lynch dissenters plus Justice
O'Connor -- held that this display violated the Establishment
Clause. Writing for the Court with respect to this issue, see
492 U.S. at 588-92, Justice Blackmun took pains to
distinguish the Allegheny County Courthouse display from
the display upheld in Lynch. "[U]nlike in Lynch," he wrote,
"nothing in the context of the display detracts from the
creche's religious message." Id. at 598. He noted that the
creche stood "alone" as "the single element of the display on
the Grand Staircase" and that "[t]he presence of Santas or
other Christmas decorations elsewhere" in the courthouse
"fail[ed] to negate the endorsement effect of the creche." Id.
at 598-99 & n. 48. Justice Blackmun rejected the suggestion
that the "floral decoration surrounding the creche" could "be
viewed as somehow equivalent to the secular symbols in the
overall Lynch display." Id. at 599. He concluded:
    In sum, Lynch teaches that government may celebrate

16

    Christmas in some manner and form, but not in a way
    that endorses Christian doctrine. Here, Allegheny
    County has transgressed this line. It has chosen to
    celebrate Christmas in a way that has the effect of
    endorsing a patently Christian message: Glory to God for
    the birth of Jesus Christ. Under Lynch, and the rest of
    our cases, nothing more is required to demonstrate a
    violation of the Establishment Clause. The display of the
    creche in this context, therefore, must be permanently
    enjoined.

Id. at 601-02.

In a separate concurrence, Justice O'Connor similarly
distinguished Lynch, stating that "[i]n contrast to the creche
in Lynch, which was displayed in a private park in the city's
commercial district as part of a broader display of traditional

secular symbols of the holiday season, this creche st[ood] alone in the county courthouse" and had the "unconstitutional effect of conveying a government endorsement of Christianity."  492 U.S. at 627 (O'Connor, J., concurring).  Three of the Lynch dissenters -- Brennan, Marshall and Stevens -- were of the view that the display of religious symbols on government property necessarily sends a messsage favoring religion.  492 U.S. at 637-46 (Brennan, J., concurring in part and dissenting in part); id. at 646-55 (Stevens, J., concurring in part and dissenting in part).  In an opinion by Justice Kennedy, four Justices dissented and would have upheld the courthouse display.  492 U.S. at 655-79.

A splintered majority of the Court reached a different conclusion concerning the second display at issue in Allegheny County, which was located in front of the City-County Building.  (A picture of this display appears at 492 U.S. at 622, Appendix B.)  The City's portion of this building houses its "principal offices, including the mayor's," 492 U.S. at 581, and is thus the functional equivalent of a city hall.  This second display included three elements:  a decorated 45-foot Christmas tree;  an 18-foot menorah that was owned by

17

Chabad, a Jewish group, but was stored, erected, and removed each year by the City; and a sign stating: "During this holiday season, the city of Pittsburgh salutes liberty.  Let these festive lights remind us that we are keepers of the flame of liberty and our legacy of freedom."  Id. at 582, 587.

Six Justices concluded that this display was constitutional, but they set out their views in three separate opinions.  First, four Justices approved Justice Kennedy's opinion, which concluded that both Pittsburgh displays satisfied the Establishment Clause.   Justice Kennedy concluded that these displays did not violate the Establishment Clause because they were noncoercive and did not give direct benefit to religion in such a degree that they established or tended to establish religion.  492 U.S. at 659, 663-667 (opinion of Kennedy, J.).  He noted that it is indisputable that government may participate in celebrating holidays with religious origins, and he added that requiring government to refrain from any use of religious symbols in connection with these celebrations would convey a message of hostility to religion.  He wrote:

     If government is to participate in its citizens' celebration
     of a holiday that contains both a secular and religious
     component, enforced recognition of only the secular
     aspect would signify the callous indifference toward
     religious faith that our cases and traditions do not
     require . . . .

Id. at 664.

Second, Justice Blackmun addressed the City-County Building display in Part VI of his opinion, which was not endorsed by any other member of the Court. 492 U.S. at 613-21 (opinion of Blackmun, J.). Justice Blackmun concluded that this display represented a celebration by the city of "both Christmas and Chanukah as secular holidays." Id. at 615. He interpreted the display to mean that "both Christmas and Chanukah are part of the same winter-holiday season, which has attained a secular status in our society." Id. at 616. He noted that the tallest object in the display, the

18

tree, is a secular symbol, and while he recognized that the menorah is a religious symbol, he suggested that it did not in context convey a religious message because of the proximity of the larger tree and the fact that, in his view, there was no comparable secular symbol of Chanukah that the City could have used. Id. at 616-18. He was fortified in this view by the mayor's sign, which saluted liberty and drew "upon the theme of light . . . common to both Chanukah and Christmas as winter festivals . . . ." Id. at 619.

Third, Justice O'Connor concluded in a separate concurrence that the "combined holiday display of a Chanukah menorah, a Christmas tree, and a sign saluting liberty d[id] not have the effect of conveying an endorsement of religion." Id. at 632. She agreed with Justice Blackmun that the Christmas tree is a secular symbol, but she felt that Justice Blackmun's analysis "obscure[d] the religious nature of the menorah and the holiday of Chanukah." Id. at 633. She viewed "the relevant question for Establishment Clause purposes" as "whether the city of Pittsburgh's display of the menorah, the religious symbol of a religious holiday, next to a Christmas tree and a sign saluting liberty sen[t] a message of government endorsement of Judaism or whether it sen[t] a message of pluralism and freedom to choose one's own beliefs." Id. at 634. She opined that the latter, secular message was the one that the display conveyed:

> By accompanying its display of a Christmas tree -- a
> secular symbol of the Christmas holiday season -- with
> a salute to liberty, and by adding a religious symbol from
> a Jewish holiday celebrated at roughly the same time of
> year, . . . the city did not endorse Judaism or religion in
> general, but rather conveyed a message of pluralism and
> freedom of belief during the holiday season.

Id. at 635 (O'Connor, J., concurring).

Justice O'Connor rejected the suggestion that the display conveyed "a message that endorses religion over nonreligion," observing that "[a] reasonable observer would . . . appreciate that the combined display [was] an effort to acknowledge the

cultural diversity of our country and to convey tolerance of different choices in matters of religious belief or nonbelief by recognizing that the winter holiday season is celebrated in diverse ways by our citizens."   Id. at 635-36.9

Because of the splintered majority in Allegheny County with respect to the constitutionality of the display in front of the City-County Building, we must employ the standard set out in Marks v. United States, 430 U.S. 188 (1977), in order to identify the Court's holding.  Specifically, we must examine the positions taken by the Justices needed to form a majority and follow the opinion that supports the majority position on the narrowest grounds.  See Katz v. Aetna Cas. & Sur. Co., 972 F.2d 53, 58 (3d Cir. 1992); Planned Parenthood of Southeastern Pennsylvania v. Casey, 947 F.2d 682, 693-94 (3d Cir. 1991), aff'd in part and rev'd in part, 505 U.S. 833 (1992).

In the case of Allegheny County, Justice O'Connor's opinion sets out the position that we must follow.  In order to be sustained, a display would have to satisfy, at a minimum, the standards set out in Justice Kennedy's opinion, which was approved by three other Justices, as well as the standards set out in Justice O'Connor's opinion.  Although Justice Blackmun also voted to sustain the display at the City-County Building, his position seemingly imposes more formidable standards, and a display would not have to meet those standards in order to survive.  Accordingly, in considering how the modified Jersey City display now before us fares under Allegheny County, we will focus on Justice O'Connor's opinion.  Before doing that, however, we will first test the modified Jersey City display against the teachings of Lynch.

_____

8. See Black Horse Pike, 84 F.3d at 1486-87 (general summary of Allegheny County).
9. The three dissenters -- Brennan, Marshall and Stevens -- held the same view of the scene in front of City Hall as they did of the creche on the great staircase.  492 U.S. at 637-46 (Brennan, J., concurring in part and dissenting in part); id. at 646-55 (Stevens, J., concurring in part and dissenting in part).

V.

The display that the Supreme Court sustained in Lynch resembles the modified Jersey City display in several important respects.  Both included one or more religious symbols owned by the city (in Lynch, a creche; in Jersey City, a creche and a menorah), as well as a variety of secular ones.  Both included one or more secular signs or banners (in Lynch, a banner proclaiming "SEASONS GREETINGS"; in Jersey City, two signs that read: "Through this display and others throughout the year, the City of Jersey City is pleased to celebrate the diverse cultural and ethnic heritages of its peoples.").  Accordingly, Lynch appears to support the constitutionality of the modified Jersey City display unless some constitutionally significant distinction can be shown.

One potentially important difference is that the display in Pawtucket was located on private property in the center of the city's business district, whereas the Jersey City display was situated in front of City Hall on public land.  In Lynch, neither the opinion of the Court nor Justice O'Connor's concurrence seemed to attribute constitutional significance to this fact.  (The opinion of the Court noted the fact in passing at the beginning of the opinion, 465 U.S. at 671, and Justice O'Connor did not mention this fact at all.)  However, Justice O'Connor's opinion in Allegheny seemed to place greater emphasis on this aspect of the Pawtucket display, 492 U.S. at 623, 626 (O'Connor, J., concurring), and therefore we will discuss this potentially significant distinction in connection with our discussion of Allegheny County.

With the possible exception of this factor, however, we see no reasonable basis for distinguishing the modified Jersey City display from the display upheld in Lynch.  The plaintiffs and our dissenting colleague suggest that the cases can be distinguished on the ground that in the modified Jersey City display "Santa Claus and Frosty the Snowman clearly do not constitute separate focal points or centers of attention coequal with the Menorah and the Nativity Scene," Appellees'

21

Br. at 14, but we see no basis for this distinction. Appendices A and B to this opinion, which depict the modified displays on both sides of City Hall in Jersey City, speak for themselves.  In the modified display on the right, the sleigh is just as much a focal point as the figures in the nativity scene.  And in the modified display on the left, the tree is just as much a focal point as the menorah.10

The dissent attempts to distinguish the modified Jersey

City display from the display in Lynch on the ground that "the Jersey City display had more and larger sectarian symbols combined with fewer secular symbols." Dissent at 35. What the record shows, however, is the following. With respect to the size of the religious symbols in the two displays, the nativity-scene figures in the Jersey City display, which ranged from 12 inches to 27 inches in height, were not larger than those in the Lynch display, which ranged in height from five inches to five feet. 465 U.S. at 671. Nor were there more figures in the Jersey City nativity scene than in the Pawtucket scene, which contained figures of "the Infant Jesus, Mary and Joseph, angels, shepherds, kings, and animals." 465 U.S. at 671. Thus, the dissent's point boils down to this: the Jersey City display differed from the Lynch display in that it included a large menorah and a smaller number of secular symbols. But any suggestion that these factors are dispositive for Establishment Clause purposes is belied by the Supreme Court's holding in Allegheny County that the display of a large menorah and one secular symbol, a Christmas tree, in front of the City–County Building in Pittsburgh was constitutional.

It is interesting that the plaintiffs deride some of the very distinctions that the dissent finds so significant. See

_____

10. The plaintiffs' reference to "separate focal points" was derived from Justice Blackmun's discussion of the display of the creche on the Grand Staircase of the county courthouse in Allegheny County. Writing for the Court in this portion of his opinion, Justice Blackmun contrasted this display, in which the creche "st[ood] alone" as "the single element of the display on the Grand Staircase," with the Pawtucket display, in which each of the secular figures "had its own focal point." 492 U.S. at 598.

22

Appellees' Br. at 15 (the court should not "engage in the fruitless exercise of determining, figuratively, `how many candy canes offset one Jesus?' . . . . There is simply no common currency or rate of exchange by which religious and secular symbols can be traded and offset."). Instead, the plaintiffs stress the District Court's observation on remand that Jersey City's addition of the secular symbols was "a ploy designed to permit continued display of the religious symbols." The suggestion seems to be that, even if Jersey City could have properly erected the modified display in the first place, the City's initial display, which was held to violate the Establishment Clause, showed that the city officials were motivated by a desire to evade constitutional requirements and that this motivation required invalidation of the modified display. Asked during oral argument whether this meant

that Jersey City might be precluded from erecting a display identical to one that would be permissible in other nearby cities, counsel for the plaintiffs insisted that Jersey City's "prior history" would have to be taken into account, at least until the time came when it could be considered to be "purged" of the "prior constitutional taint."  Oral Arg. Tr. at 27.

We reject this argument.  The mere fact that Jersey City's first display was held to violate the Establishment Clause is plainly insufficient to show that the second display lacked "a secular legislative purpose," see Lemon, 403 U.S. at 612-13, or that it was "intend[ed] to convey a message of endorsement or disapproval of religion."  Lynch, 465 (O'Connor, J., concurring).  As our prior discussion of Lynch and Allegheny County illustrates, the Supreme Court's decisions regarding holiday displays have been marked by fine line-drawing, and therefore it is not easy to determine whether particular displays satisfy the Court's standards.  Under these circumstances, the mere fact that city officials miscalculate and approve a display that is found by the federal courts to

23

cross over the line is hardly proof of the officials' bad faith.11 Although the original Jersey City display was ultimately struck down, no Supreme Court or Third Circuit precedent clearly established that it was unconstitutional until the prior panel handed down its decision, and therefore the city officials' decision to continue to erect that display, which had been put up for decades, can hardly be viewed as evidence of an intent to flout the Establishment Clause.12

We now consider how the modified Jersey City display fares under the holding of the Supreme Court in Allegheny County. The Court's decision striking down the display of the creche on the Grand Staircase of the Allegheny County Courthouse does not cast doubt on the constitutionality of the modified Jersey City display.  As noted earlier, the display on the Grand Staircase consisted of a creche with a religious proclamation ("Gloria in Excelsis Deo") surrounded by a floral decoration that "serve[d] only to draw one's attention" to the creche.  492 U.S. at 598-99.  The display contained no secular symbols, and the display did not communicate to a reasonable observer the sort of secular message that is needed to pass Establishment Clause scrutiny, e.g., acknowledgment of "the cultural diversity of our country" and support for "tolerance of different choices in matters of religious belief or nonbelief by recognizing that the winter holiday season is celebrated in diverse ways by our citizens." Allegheny County, 492 U.S. at 636 (O'Connor, J., concurring). The modified Jersey City display expressly conveyed this very message by means of its sign and implicitly conveyed the

11. If reaching the erroneous conclusion that a particular display is constitutional is regarded as proof of an intent to flout the Establishment Clause, are Allegheny County dissenters implicated by virtue of their views?

12. The plaintiffs' position is also contrary to the Supreme Court's treatment of the two displays at issue in Allegheny County. If the plaintiffs' view were correct, the erection of the unconstitutional display on the Grand Staircase of the County Courthouse should have militated in favor of also striking down the display in front of the City-County Building, but a majority of the Supreme Court sustained that display, and not one Justice took the position that the officials' miscalculation regarding the Grand Staircase tainted the decision concerning the City-County Building.

same message through its diverse nonverbal elements. Thus, the unconstitutional display on the Grand Staircase of the Allegheny County Courthouse is readily distinguishable from the modified Jersey City display.

On the other hand, there are instructive parallels between the constitutionally permissible display in front of the City-County Building and the modified Jersey City display. (Indeed, the photograph of the City-County Building display, see 492 U.S. at 622, and the display on the left-side of Jersey City's City Hall (see Appendix A of this opinion) are virtually identical except for the presence of Santa in the latter display). First, both displays contained both secular and religious symbolism. It is true that the City-County Building display included fewer religious symbols (a menorah only) than the modified Jersey City display (both a menorah on the left side of City Hall and a creche on the right), but the City-County Building display also included fewer secular symbols, and in both cases the balance seems to have been roughly the same. Moreover, Justice O'Connor's opinion in Allegheny County refutes any suggestion that the display of a menorah is inherently less likely to create Establishment Clause problems than is the display of a creche. Eschewing the suggestion that Chanukah is "a `secular' holiday" or that "the menorah has a `secular dimension,"' she pointedly wrote that "the menorah is the central religious symbol and ritual object of [a] religious holiday." 492 U.S. at 633-34. She similarly rejected the idea that, because "it would be implausible for the city to endorse a faith adhered to by a minority of the citizenry," inclusion of a menorah in a holiday display is less likely than a Christian religious symbol to convey a message of government endorsement of religion. Id. at 634. She wrote that "[a] menorah standing alone at city

hall may well send such a message to nonadherents, just as in this case the creche standing alone at the Allegheny County Courthouse sends a message of governmental endorsement of Christianity . . . ."  Id.

Second, the strong similarity between the location of the City-County Building display (on public land in front of what

25

is in essence Pittsburgh's City Hall) and the location of the Jersey City display (on public land in front of City Hall) is particularly important in light of our earlier conclusion that the only basis on which the Pawtucket display upheld in Lynch might potentially be distinguished from the modified Jersey City display was that the former display was located on private land in the city's business district.  The portion of Justice O'Connor's separate opinion in Allegheny County relating to the display on the Grand Staircase suggested that this distinction had some significance.13  But when Justice O'Connor turned to the display in front of the City-County Building -- a location indistinguishable for present purposes from the site of the Jersey City display -- she held that the display was constitutional.  (The other factors that Justice O'Connor stressed in this portion of her Allegheny County opinion -- the tree and the sign -- also have close parallels here).  This persuades us that the location of the Jersey City display on public property in front of City Hall does not in itself provide a valid basis for holding the display to be unconstitutional.

Moreover, although this factor is not necessary to our decision, we are convinced that, in evaluating the message conveyed by the modified Jersey City display to a reasonable observer, the general scope of Jersey City's practice regarding diverse cultural displays and celebrations should be considered.  In our en banc decision in ACLU of N.J. v. Black Horse Pike Reg'l Bd. of Ed., 84 F.3d 1471 (3d Cir. 1996), we held that, in determining whether a government practice endorses religion, " `the "history and ubiquity" of a practice is relevant because it provides part of the context in which a reasonable observer evaluates whether a challenged governmental practice conveys a message of endorsement of

_____

13. Justice O'Connor noted that the creche in Lynch had been "displayed in a private park in the city's commercial district," and she opined that "[t]he display of religious symbols in public areas of core government buildings runs a special risk of `mak[ing] religion relevant, in reality or public perception, to status in the political community.'"  492 U.S. at 626 (O'Connor, J., concurring (quoting Lynch,

465 U.S. at 692 (O'Connor, J., concurring)).

religion.' " Id. at 1486 (quoting Allegheny County, 492 U.S. at 630 (O'Connor, J., concurring)); see also Capitol Square Review and Advisory Bd. v. Pinette, 115 S.Ct. 2440, 2455 (1995) (O'Connor, J., concurring) ("the reasonable observer in the endorsement inquiry must be deemed aware of the history and context of the community and forum in which the religious display appears"; "the knowledge attributed to the reasonable observer [cannot] be limited to the information gleaned simply from viewing the challenged display"). To the extent that the prior panel opinion, see 104 F.3d at 1448-49, conflicted with our prior en banc decision in Black Horse Pike, the prior en banc decision must of course take precedence.

In sum, we are unable to perceive any meaningful constitutional distinction between the display at issue here and those that the Supreme Court upheld in Lynch and Allegheny County. Reasonably viewed, none of these displays conveyed a message of government endorsement of Christianity, Judaism, or of religion in general but instead "sent a message of pluralism and freedom to choose one's own beliefs." Allegheny County, 492 U.S. at 633 (O'Connor, J., concurring). If we follow Lynch and Allegheny County, we have no alternative but to reverse the permanent injunction insofar as it enjoins Jersey City from erecting the modified display "or any substantially similar scene or display in the vicinity of the entrance to the City of Jersey City's City Hall." Indeed, even if we were persuaded that the modified display itself was unconstitutional, we could not possibly approve an injunction against "any substantially similar scene or display." Both the Pawtucket display and the display in front of the City-County Building in Pittsburgh were, at the least, "substantially similar" to the modified Jersey City display, and consequently the District Court's injunction has the obviously improper effect of enjoining displays that are identical to ones that have passed the Supreme Court's scrutiny.

The dissent's attempt to distinguish the modified Jersey City display from the display upheld in Allegheny Court is

unpersuasive. The dissent first observes that in Allegheny County the 45' tall Christmas tree "dwarfed the 18' tall menorah." Dissent at 36. The reader can compare the photograph of the display sustained in Allegheny County (see 492 U.S. at 622) with Appendix A to this opinion (the left side

of the Jersey City display) and make an independent judgment as to whether the two scenes are constitutionally distinguishable. In our view, they are not. The two menorahs are comparable in height (18' tall in Allegheny, 19' tall in Jersey City), and although the tree in Pittsburgh appears larger than that in Jersey City, it is difficult to believe that this difference in height is dispositive.

The dissent next observes that "a display's location informs the constitutional analysis" (Dissent at 36), but the dissent obscures the fact that the display upheld in Allegheny County and the Jersey City display were located in comparable spots: on public land in front of the building that housed the principal offices of the municipal government.

The dissent notes that "Jersey City used public funds to own, erect, and maintain the creche and the menorah." Dissent at 37. But in Allegheny County, the menorah was also "stored, erected, and removed each year by the city." 492 U.S. at 587 (opinion of Blackmun, J.). And in Lynch, the city owned, erected, and dismantled the creche. 468 U.S. at 671.

Finally, the dissent argues that, whereas "a display containing only a menorah and a Christmas tree" may be constitutional, "when a creche and a menorah are displayed together, `the menorah's religious significance is emphasized.' " Dissent at 37 (quoting Schundler I, 104 F.3d at 1446). This statement overlooks the fact that the creche and menorah were displayed on opposite sides of the City Hall Plaza Park. See Appendix C. More important, since Lynch teaches that display of a creche is not per se unconstitutional, and Allegheny County teaches that the same is true of a menorah, it is hard to accept the proposition that the Establishment Clause is violated when

28

these two symbols are displayed together as part of a holiday display that includes secular symbols and is dedicated to the celebration of a municipality's cultural diversity.

VI.

Before concluding, we find it necessary to explain why we do not agree with some of the prior panel's dicta regarding the modified display. Our central point of disagreement concerns the prior panel's suggestion that any inclusion of a creche -- but not a menorah -- in a display in front of a prominent government building, such as a city hall, is incompatible with the Establishment Clause. The prior panel observed:

> Government display of a creche [unlike a menorah]
> cannot convey a meaning separate from the very act it is
> meant to portray. A creche depicts the Birth of Christ,
> the event that lies at the foundation of Christianity. In
> Allegheny County, the Court determined that displays
> containing a creche as a primary focal point, which are
> situated at the seat of governmun, are constitutionally
> impermissible as they convey a message of government
> endorsement. This is consistent with Lynch, in which
> the Court permitted a creche that was part of a display
> in a private park depicting a "winter wonderland" scene
> because, in context, there were no external indicia of
> government endorsement.

104 F.3d at 1451.

We respectfully submit, in part for reasons that we have
already discussed, that this dicta misinterprets both Lynch
and Allegheny County. First, the distinction that is drawn
between a creche and a menorah necessarily rests on the
mistaken view that these two symbols differ critically with
respect to the nature or degree of the religious message that
they convey. As we have explained, however, Justice
O'Connor flatly rejected this suggestion in her pivotal
Allegheny County opinion. See 492 U.S. at 633-34 (opinion

29

of O'Connor, J.). Once it is recognized that a creche and a
menorah should be regarded as equivalent religious symbols
for the purpose of analyzing holiday displays, the similarity
between the constitutionally permissible display in front of
the City-County Building in Pittsburgh and the modified
display in front of Jersey City's City Hall becomes apparent.

Second, we cannot agree with the prior panel's suggestion
that in Lynch "the Court permitted a creche that was part of
a display in a private park depicting a `winter wonderland'
scene because, in context, there were no external indicia of
government endorsement." 104 F.3d at 1451 (emphasis
added). As we have noted, in Allegheny County, Justice
O'Connor, as well as Justice Blackmun, seems to have
attributed some significance to the fact that the display in
Lynch was situated on private property in the center of
Pawtucket's commercial district, but to go further, as the
prior panel did, and say that the Pawtucket display bore "no
external indicia of government endorsement" is not correct.
In Lynch, every Justice, whether in the majority or the
dissent, agreed that by means of its holiday display the city
of Pawtucket was endorsing some message. The Justices
differed in their interpretation of the message that the display
conveyed, but they all understood that the message was
linked to the City -- as the lower court opinions in that case

made abundantly clear:

> [I]t is difficult to suggest that anyone could have failed to receive a message of government sponsorship after observing Santa Claus ride the city fire engine to the park to join with the mayor of Pawtucket in inaugurating the holiday season by turning on the lights of the city-owned display.  See Donnelly v. Lynch, 525 F. Supp. 1150, 1156 (RI 1981).  Indeed, the District Court in Lynch found that `people might  reasonably mistake the Park for public property,' and rejected as `frivolous' the suggestion that the display was not directly associated with the city.  Id., at 1176, and n. 35.

Allegheny County, 492 U.S. at 666-67 (opinion of Kennedy,

30

J.).  Once these two points are recognized -- that the menorah and the creche must be viewed for present purposes as equivalent religious symbols and that the display in Lynch indisputably involved the conveyance of a government message -- the foundation of the prior panel's dicta is undermined.

VII.

For these reasons, we affirm the decision of the District Court insofar as it denied the defendants' motion under Rule 60(b)(5) for relief from the Court's previous judgment. However, we reverse the District Court's order insofar as it disposed of the parties' cross-motions for summary judgment with respect to the modified display and insofar as it enjoined the defendants from erecting that or any substantially similar display.  We remand the case to the District Court with instructions to grant summary judgment in favor of the defendants.

31

NYGAARD, Circuit Judge.  Dissenting.

I have two reasons for dissenting.  First, I dissent because I believe that the argument urged upon us by appellant undermines our earlier decision in this case.  Following Schundler I, addressing the original display, I still conclude that the addition of a few small token secular objects is not enough to constitutionally legitimate the modified display. Although appellant strives mightily to explain what we did not hold in Schundler I, I believe it more important to

determine what we did hold. We explicitly held that the display at issue here, minus Frosty, Santa, the sleigh, and the Kwanzaa symbols, was unconstitutional because it had the effect of communicating an endorsement of particular religions. So, I submit that the real question now is whether simply adding Kwanzaa symbols to the tree and placing Frosty (a secular symbol of Christmas), Santa (a once-religious symbol -- St. Nicholas -- now quite secularized), and a sleigh in the display sufficiently changed the display's context so as to negate the message that was conveyed by the original display, which we held unconstitutional.

The second, albeit weaker, reason why I dissent is that although the majority cites the applicable Supreme Court case law to reach its conclusion that this display is constitutional, parsing the same law and applying it to these facts leads me to the opposite conclusion. There is, I readily acknowledge, much confusion and plenty of room for jurisprudential disagreement in this area. No bright lines of demarcation have been drawn between religious "establishment" and simple display, and perhaps none of us is capable of accurately drawing such a line given the state of the case-law. I am afraid that the shifting majorities and fact-specific opinions of the Supreme Court in Lynch and Allegheny County provide only a precarious analytical framework for both the public and we inferior federal courts to apply in determining the exact location of the line of demarcation.

The Supreme Court's two major recent excursions into this

area have resulted in fractured majorities and no clear statement of the law. Nonetheless, it seems to me that the Court has directed us to evaluate religious symbols in the context of the entire display. As we noted in Schundler I, "the Supreme Court, in its myriad of approaches in the display cases, has repeatedly emphasized the importance of examining the context of the display at issue to determine whether it has the effect of endorsing religion." Schundler I, 104 F.3d at 1451. We reaffirmed the significance of context when we examined Allegheny County and Lynch "to illustrate `the importance of the context of a challenged practice' in conducting an Establishment Clause analysis." Id. (quoting ACLU v. Black Horse Pike Reg'l Bd. of Educ., 84 F.3d 1471, 1484 (3d Cir. 1996) (en banc)). Following the Supreme Court's decisions in Lynch and Allegheny County, I conclude that Jersey City's modified display resulted in an unconstitutional establishment of religion.

A. Lynch

First, our display is unlike the display that the Supreme
Court allowed in Lynch.  The majority sees "no reasonable
basis," other than the different locations of the displays, "for
distinguishing the modified Jersey City display from the
display upheld in Lynch."  Majority Opinion at 21.  I believe
that this analysis of the display fails to adequately credit the
different contexts of the two displays.  When looked at in its
context, I believe that the constitutional display in Lynch is
distinguishable.  The display approved by the Court in Lynch
included, in addition to a creche (the only religious symbol),

> a Santa Claus house with a live Santa distributing
> candy; reindeer pulling Santa's sleigh; a live 40-foot
> Christmas tree strung with lights; statues of carolers in
> old-fashioned dress; candy-striped poles; a "talking"
> wishing well; a large banner proclaiming "SEASONS
> GREETINGS"; a miniature "village" with several houses
> and a church; and various "cut-out" figures, including
> those of a clown, a dancing elephant, a robot, and a
> teddy bear.

33

Allegheny County, 492 U.S. at 596, 109 S. Ct. at 3102
(opinion of Blackmun, J.).  The Court in Allegheny County
noted that the Lynch display was composed of a series of
figures and objects, each group of which had its own focal
point.  See id. at 598, 109 S. Ct. at 3104 (opinion of the
Court).  The various objects each had a separate "visual story
to tell."  Id., 109 S. Ct. at 3104.

Contrasting the Lynch display, with its "superabundance
of secular symbols [which] dilute[d] the message of the
creche," Amancio v. Town of Somerset, No. Civ.A.
98CV12810RGS, 1998 WL 846865, *3 (D. Mass. Nov. 23,
1998) (finding display consisting of a creche, holiday lights,
a wreath, a Christmas tree, and a plastic Santa Claus
unconstitutional), with the Jersey City display reveals a
different context.  Here, rather than a "superabundance" of
secular objects, only a handful of nonsectarian objects were
placed in the display, none of which, other than the
Christmas tree, could have reasonably been considered a
separate focal point.  I would not underestimate the essential
importance to the Supreme Court majority of the numerous
secular objects surrounding the creche in Lynch.  As the
Second Circuit Court of Appeals noted,

> After Allegheny and Lynch, therefore, not every
> city-owned-and/or-displayed creche violates the
> Establishment Clause.  Lynch squarely upheld a city's
> erection of a creche that it owned as part of its
> Christmas display in a park owned by a nonprofit
> organization.  A key factor leading to that conclusion,

especially in light of the later Allegheny decision, was that the creche was only a small part of an otherwise secular display.

Elewski v. City of Syracuse, 123 F.3d 51, 54 (2d Cir. 1997) (upholding a holiday display of a creche in light of the context) (emphasis added) (citations omitted), cert. denied, 118 S. Ct. 1186 (1998). Although I disagree with the Elewski opinion in light of Lynch, nonetheless even if we apply its reasoning to the Jersey City display, the creche and menorah

were certainly not "small parts" of an otherwise secular display. The only reasonable interpretation, as we noted in Schundler I, is that Frosty and Santa composed a small secular part of an otherwise sectarian display, not the other way around.

Rather than the seasonal, "winter wonderland" scene in Lynch, Jersey City erected a display that a reasonable observer would interpret as having three symbolic focal points: the creche, the menorah, and the Christmas tree.1 The same three focal points that were found to result in an unconstitutional endorsement of religion by this Court in Schundler I.2 Indeed, the modified display perhaps provides a more substantial example of endorsement than the original display because the characters of the creche were removed from their isolated, sheltered position in the manger to a more prominent position beside it. See Schundler I, 104 F.3d at 1439. Compared to the display in Lynch, the Jersey City display had more and larger sectarian symbols combined with fewer secular symbols. This created a different context

_____

1. Appellant argues that because the tree was comparable in size to the menorah, it created a separate focal point. This argument is irrelevant in light of our holding in Schundler I. In that case, we expressly held that the presence of the Christmas tree did not make the display constitutional. In Schundler I, we determined that the Christmas tree had a secular effect, and the mere addition of Kwanzaa ornaments to the tree certainly does little to enhance the already secular effect.

In addition, applying a sort of Blackmun yardstick test, appellant appears to argue that the 4' tall Santa and the 3'10" tall Frosty created separate focal points that operated to neutralize the sectarian message conveyed by the 14' tall menorah and the over 45' square, 7' tall manger with a separate nativity scene. The snowman was located to the back left of the manger, approximately 35 feet away from the manger. See App. 48. Santa Claus, on the other hand, was located across the walkway, situated between

the 13' tall tree and the 14' tall menorah.  These token figures simply did not substantially detract from the unconstitutional sectarian message conveyed by the original display.  See Schundler I, 104 F.3d at 1452.

2. We also placed a great deal of emphasis on the location of the display on the front steps of City Hall in Schundler I.  I will follow the majority's lead and discuss this aspect of the case when dealing with Allegheny County.

and resulted in a different message, one of government endorsement of religion.

B.  Allegheny County

Nor do I think that Allegheny County supports the conclusion that the Jersey City display was constitutional. It can be argued that, when looking at the secular and sectarian elements, the balance seems to have been "roughly" the same in the Jersey City display and the Allegheny County display located on the front steps of the City-County Building. I think that statement underestimates the importance of the context of the display by eliding the difference in the size and location of the various elements.  In Allegheny County, the 45' tall Christmas tree was "clearly the predominant element in the city's display" on the steps of the City-County Building.  Allegheny County, 492 U.S. at 617, 109 S. Ct. at 3113 (opinion of Blackmun, J.).  The tree dwarfed the 18' tall menorah, which was placed to the side of the tree's central position beneath the middle archway in front of the building.  See id.  This clearly contrasts the Allegheny County display with the Jersey City display in which, on both sides of the display, the "predominant" element was sectarian.

Although not determinative, a display's location informs the constitutional analysis.  As Justice O'Connor stated in Allegheny County, "[t]he display of religious symbols in public areas of core government buildings runs a special risk of `mak[ing] religion relevant, in reality or in public perception, to status in the political community.' "  492 U.S. at 626, 109 S. Ct. at 3119 (O'Connor, J., concurring) (alteration in original) (quoting Lynch, 465 U.S. at 692, 104 S. Ct. at 1369 (O'Connor, J., concurring)).  When dealing with the original display in the exact same location in Schundler I, we stated,

> When a government chooses to speak by erecting a
> creche on government property, the principles at the core
> of the Establishment Clause are clearly implicated.  By
> erecting the creche itself, on city property, a city sends
> a stronger message of endorsement of religion than when

> it merely provides a forum for private religious speech.
> In the former context, the government is effectively
> conveying the message that "we celebrate the holiday
> season by recognizing the birth of Christ."

Schundler I, 104 F.3d at 1445 (citation omitted).  What is
clear then is that when a display containing religious
elements is located in front of the main city government
building, we should recognize that the possibility of sending
a message of religious endorsement to the reasonable
observer is augmented.3

We must not overlook an important basis of our decision in
Schundler I:  In finding the display unconstitutional, we relied
on the fact that Jersey City used public funds to own, erect,
and maintain the creche and the menorah.  Although not a
deciding factor, we noted that "by using taxpayer dollars to
fund a display containing religious symbols, Jersey City has
increased the risk that the display's religious message will be
attributed to the city and its taxpayers."  Id. at 1445-46; see
also Elewski, 123 F.3d at 57 (Cabranes, J., dissenting)
(noting that government sponsorship is "a relevant and
important factor").  The modified display here is subject to
the same infirmity.

In Allegheny County, the Court allowed a display
containing only a menorah and a Christmas tree.  We,
however, have found that when a creche and a menorah are
displayed together, "the menorah's religious significance is
emphasized."  Schundler I, 104 F.3d at 1446.  In Allegheny
County, Justice O'Connor found that, even though the
religious message of the menorah was not entirely
neutralized, any message of government endorsement was

_____

3. Justice O'Connor approved the display in Allegheny County that was
situated on the steps of a government building.  Since she allowed that
display, it can be argued that the location of the Jersey City display
does not in itself provide a valid basis for holding the display to be
unconstitutional.  Although I agree that this factor alone does not
justify finding a display to be unconstitutional, it is certainly an
aspect that should be taken into account when determining the message
conveyed by the display.

negated by the presence of the much larger Christmas tree. See Allegheny County , 492 U.S. at 635, 109 S. Ct. at 3123 (O'Connor, J, concurring).  In Jersey City, however, the religious aspect of the menorah was underscored by the rest of the display.4  In this case, the menorah is more reasonably viewed in light of the presence of the creche, not the tree.  In Allegheny County, the menorah outside the City-County Building was privately owned and its religious message was not accentuated by the additional presence of a creche representing the stable wherein Jesus was born.  These facts distinguish the Allegheny County display from this one.

To support its argument that no sectarian message was delivered, appellant points to the two signs proclaiming that the display was part of a year-round celebration of diversity. The value of the signs should be considered in light of, and is wholly negated by, the fact that the original display we held unconstitutional contained the same sign.  Furthermore, the sign clearly states that Jersey City is supporting the display, removing any doubt from the reasonable observer's mind concerning whether the display was private speech or government speech.  Although informative, the mere presence of signs stating that the display was part of a celebration of ethnic and cultural differences does little to negate the impact of the sectarian message.5

_____

4. It can be argued that Justice O'Connor's opinion in Allegheny County seems to  rebut Justice Blackmun's argument in the same case that a menorah is an inherently less religious symbol than a creche.  I am not sure I agree with that because when a reasonable observer sees a menorah what would she or he think of except the miracle of the oil, or of the holy candelabrum in the Jewish Temple, and of the Jewish Festival of Lights.  Moreover, although the religious impact of a menorah standing alone was debatable, at least by the members of the Supreme Court, we have found that the combination of a menorah with a creche communicates a clearly sectarian message.  See Schundler I, 104 F.3d at 1446.
5. As Justice Blackmun stated, "The simultaneous endorsement of Christianity and Judaism is no less constitutionally infirm than the endorsement of Christianity alone."  Allegheny County, 492 U.S. at 615, 109 S. Ct. at 3112 (opinion of Blackmun, J.)

Appellant argues that Schundler I incorrectly determined that a reasonable observer would not be aware of Jersey City's other celebrations throughout the year.  Assuming arguendo that the earlier panel was incorrect, looking at the

history of this display and others in Jersey City does little to save the modified display from its message. I am not exactly sure what a reasonable observer would think. I doubt, however, that he or she would question long why the creche and menorah were on the City Hall lawn before concluding that it was to celebrate Christmas and Hanukkah. I also think that the reasonable observer, looking at the modified display, would be aware of the various ethnic and cultural celebrations throughout the year. In addition, the reasonable observer would likely know that no other religious celebrations occurred in front of City Hall. The reasonable observer would see that the display is larger than any other display in front of City Hall. The reasonable observer would realize that the display was in place longer than any other display, secular or sectarian, that occupied the very visible space in front of City Hall.6 Finally, the reasonable observer would likely remember that for approximately thirty years, Jersey City had erected a virtually identical display that we found endorsed religion in violation of the First Amendment of the United States Constitution.

_____

6. From my examination of the record, the only evidence of other displays erected by Jersey City in front of City Hall comes from the deposition of the mayor, Bret Schundler.

> Q. Apart from the menorah and the nativity scene, can you recall any other displays erected on the city's initiative that have been erected in front of City Hall?
>
> A. I'm sure there have been.
>
> Q. Do you have any specific recollections of any examples, as we sit here today?
>
> A. We have had memorial week out there, we have flags out there, as you know, which is right in front of City Hall, celebrating every group under the sun.

App. 160.

After thirty years of religious promotion by Jersey City in front of City Hall, the reasonable observer would likely see the addition of the secular figures, which "lacked the physical sturdiness and careful positioning of the religious symbols," Dist. Ct. at 10, as we saw them in our previous opinion -- "token additions" which do little to "secularize" the "conveyed . . . message of government endorsement of religion." Schundler I, 104 F.3d at 1452 & n.19 (noting the "artful[ ]"

argument of the ACLU that the reasonable observer would no doubt characterize the additional figures as "attempts at evasion of constitutional prohibitions through superficial secular tokenism"); see also Dist. Ct. at 10 (finding that the addition of the secular symbols was "a ploy designed to permit continued display of the religious symbols"); ACLU v. City of Florissant, 17 F. Supp. 2d 1068, 1075-76 (E.D. Mo. 1998) (finding, on similar facts, that adding secular figures to a previously sectarian display did not "negate or muffle the earlier message of endorsement"). I am aware of no Supreme Court holding that allows the government to make a religious pronouncement at Christmas and Hanukkah as long as it has made a sufficient number of secular pronouncements at other times of the year. Although Jersey City certainly has separate ethnic and cultural celebrations, this does not obscure the fact that for several weeks of every year, the city government erected a display that communicated a religious message. The Supreme Court's interpretation of the First Amendment simply does not allow the government to do that.

C.  Lack of Supreme Court Standard

This case, after four years of litigation, underscores what I stated earlier about the problems with the standards and analyses provided by the Supreme Court in this area. In the course of this litigation, we have twice been asked to evaluate the constitutionality of two virtually identical displays. We have come to two directly opposite conclusions. What has resulted is an intra-circuit split in the truest sense of the phrase.

40

The inconsistent results in this Court can be directly attributed to the insufficient and inconsistent guidance given to the inferior federal courts – or, perhaps as I earlier mused, the behavior at issue here is incapable of being guided. In both Lynch and Allegheny County, the Supreme Court could not agree on the correct analysis, much less the correct application of a standard to the facts. After Capitol Square Review & Advisory Board v. Pinnette, 515 U.S. 753, 115 S. Ct. 2440 (1995), it now appears that a majority of the Supreme Court has at least accepted that government-sponsored religious speech should be evaluated under the endorsement test. Until the Supreme Court decides a case in which a majority opinion of the Court utilizes a clear test to analyze a religious display, we are left with fact-specific inquiries that focus on the size, shape, and inferential message delivered by displays with religious elements, leaving almost any display that has a religious symbol in it open to challenge and any such display that has secular elements, no matter how trivial, open to judicial approval.

Unfortunately, Justice Kennedy's prediction in Allegheny County has come true. "[A] jurisprudence of minutiae" relying on "little more than intuition and a tape measure" has resulted from the unclear analyses contained in the various opinions of the Supreme Court. Allegheny County, 492 U.S. at 674-76, 104 S. Ct. at 1359-60 (Kennedy, J., concurring in the judgment in part and dissenting in part).

D. Lack of Consistency

Were the foregoing the only reason for my disagreement, I may not have written a dissent; or if so, it would may well have suffered the same end as most others I write. However, there is another aspect of this case -- the fact that we have already addressed the display at issue here, and that, in my opinion, the majority's opinion slices our earlier holding too thinly. As I noted earlier, in light of the holding in Schundler I, the only question for us today is whether the additions of Santa, Frosty, a sleigh, and some Kwanzaa ribbons rehabilitate a display that we held to be an unconstitutional

endorsement of religion. The majority, however, goes beyond this issue to question the central holding and reasoning underlying an earlier opinion of this Court--a close reading of the majority's holding reveals that the decision does not only rely on the presence of the figures or the Kwanzaa ribbons. Therefore, the majority would effectively overrule one of our own opinions: a task reserved for the en banc Court. Although this event would be cause for alarm in any case, my dismay is heightened here where the second opinion emanates from the exact litigation as the first. In this instance, the concern for the consistency of the law and the legitimacy our jurisprudence is intensified. Of course the law of religious displays is characterized by intensive fact analysis and questionable line drawing, and it is possible to disagree with our prior holding and analysis; however, to protect the integrity of our jurisprudence, I cannot condone the appearance of one panel overruling another.

We have the duty not only to review cases and point out error, but also to provide guidance. We cannot ask others to respect the integrity of our decisions when we ourselves do not; but instead evade the reasoning of a prior panel in the same case. This case is unique in that we have already expressed our views on the precise issue and nearly identical facts that are the subject of this appeal. We stated, albeit in dictum, when addressing the exact display at issue here, that

> [t]he token additions of the secular symbols do little to
> alter the "context" or the focal points of the City's
> display. We reiterate that Jersey City's display of the

creche at the seat of City government power impermissibly conveyed a message of government endorsement of religion.  And, in our view, the City's addition of Santa, Frosty, and a red sled did little to secularize that message.

Schundler I, 104 F.3d at 1451.  Although dictum, the language fulfills our responsibility to instruct and guide the District Court.

42

On remand, the District Court scrupulously followed our instructions and reasoning and determined that the modified display violated the Establishment Clause.  The District Judge made this determination, even though he may not have agreed with it, because he felt duty-bound, in an area of law fraught with uncertainty, to follow what he perceived to be the instructions we had given him.  Now, reexamining the same display almost two years after Schundler I, this Court finds that the addition of the figures of Santa and Frosty, who was lashed to a tree next to the sleigh, do in fact neutralize the unconstitutional message of endorsement that had been conveyed by Jersey City for three decades and reverses itself concerning the appropriateness of our earlier instructions.  This constitutional about-face in the same case troubles me greatly, strikes to the core of the legitimacy of our jurisprudence, and exposes us to well-earned criticism for inconsistency and for giving insufficient respect to an earlier instruction by the Court.

E.  Conclusion

I conclude that the message of this display remains the same as that of the original display.  On one side, the menorah and the Christmas tree tower over the Santa Claus.  On the other side, a manger, representing the site where Jesus was born, dominates the scene.  Next to the manger, a cart and a nativity scene reflect the action that myth says surrounded the birth of Jesus.  Off to the side is the sleigh, and the snowman is placed behind and to the side of the scene.  The dominant element of each side of the display is a religious symbol.  Looking at the display as a whole, rather than focusing on only those elements that were also present in the constitutional displays in Lynch or Allegheny County, it seems to me that the dominant message of the display is an endorsement of religion.

By underestimating the importance of the size, location, and number of the secular elements of the display, we have now essentially given governments free reign to design their religious displays in as sectarian a manner as possible.  In

addition, if the government should happen to cross the line
and convey an unconstitutional message, it needs merely to
add one or two more token secular figures and try again.  I do
not think this is the proper message to deliver.

A True Copy:
Teste:

     Clerk of the United States Court of Appeals
     for the Third Circuit

44

Appendix A

45

Appendix B

46

Appendix C

47