**Jarrod SECHLER and David Warren Saxe, Plaintiffs,**

**v.**

**STATE COLLEGE AREA SCHOOL DISTRICT and Dr. Patricia Best, in her official capacity as Superintendent of the State College Area School District, Defendants.**

**No. 4:CV–00–0508.**

United States District Court, M.D. Pennsylvania.

Nov. 17, 2000.

Bryan J, Brown, Stephen M. Crampton, Brian Fahling, American Family Ass'n Center for Law & Policy, Tupelo, MS, Scott A. Williams, Williamsport, PA, for Plaintiffs.

David B. Consiglio, John R. Miller, Miller, Kistler, Campbell, Miller, Williams & Benson, Inc., State College, PA, for Defendants.

## MEMORANDUM

McCLURE, District Judge.

### BACKGROUND:

On March 17, 2000, plaintiffs Jarrod Sechler and David Warren Saxe commenced this action with the filing of a complaint pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201, 2202. Sechler alleged that he was barred from participation in a volunteer lunchroom chaperon program at the State College Area High School because he is a "youth pastor" at a Christian church. Saxe complained that there were no Christian symbols displayed at a winter holiday program at the Corl Street Elementary School, while emblems of other religions were displayed. The High School and the Elementary School are part of defendant State College Area School District (SCASD), of which defendant Dr. Patricia Best is the superintendent. Plaintiffs claimed that the conduct of defendants violated their rights under the First Amendment to the Constitution of the United States and analogous provisions of the Pennsylvania Constitution.

On April 27, 2000, a hearing on Sechler's motion for a preliminary injunction began, but the motion was withdrawn after the testimony of the first witness. The claims on behalf of Sechler also have been withdrawn. Notice of Dismissal (record document no. 27) filed June 5, 2000. The remaining causes of action are Saxe's claims under § 1983 and the First Amendment for establishing religion and hostility toward the Christian religion. All of the parties' arguments have been raised in the context of the First Amendment, and the Pennsylvania Constitution is not discussed. We therefore confine our analysis to the First Amendment, and presume that the disposition of the state constitutional claims would be the same. *See generally Haller v. Commonwealth, Dept. of Reve-*

*nue,* 693 A.2d 266, 268 n. 7 (Pa. Commw.Ct.1997) (noting that Supreme Court of Pennsylvania has found federal and state constitutions "equally apposite" in cases decided since First Amendment held applicable to states), *aff'd,* 556 Pa. 289, 728 A.2d 351 (1999),[1] *cert. denied sub nom. Penna. Pennsylvania Dept. of Revenue v. Newman,* — U.S. —, 120 S.Ct. 325, 145 L.Ed.2d 253 (1999).

Before the court is a motion by defendants to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6). Saxe's motion for a preliminary injunction is not yet ripe for disposition but will be denied based on our resolution of the motion to dismiss. Also, Saxe filed a motion to strike an affidavit which included a "response" to a "motion" by defendants to strike certain exhibits appended to Saxe's second affidavit. Saxe's motion to strike was withdrawn when the offending affidavit was withdrawn, both by stipulation of the parties. Although the "response" remains of record as a pending motion, no motion was filed requiring a response; the "motion" is a suggestion within defendants' reply brief. We will treat both matters as argument regarding the effect to be given to exhibits appended to Saxe's second affidavit, and deny the "response" for statistical purposes.

### DISCUSSION:

#### I. STANDARD

A motion to dismiss under Rule 12(b)(6) admits the well pleaded allegations of the complaint, but denies their legal sufficiency. *Hospital Building Co. v. Trustees of the Rex Hospital,* 425 U.S. 738, 740, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976). The complaint must be construed in favor of the plaintiff with every doubt resolved in the plaintiff's favor. *In re Arthur Treacher's Franchise Litigation,* 92 F.R.D. 398, 422 (E.D.Pa.1981). That is, the court must

1. In affirming, the Supreme Court of Pennsylvania confined itself to First Amendment Analysis. *See esp.* 556 Pa. 289, 728 A.2d 351 (affirming "Commonwealth Court's determi-

nation that this tax exemption violates the Establishment Clause of the United States Constitution"; footnote omitted).

accept as true all factual allegations set forth in the complaint as well as all reasonable inferences that can be drawn from them. *Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir.1996); *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir.1994). The court looks only to the facts alleged in the complaint and any attachments, without reference to any other parts of the record. *Jordan* at 1261. "[A] case should not be dismissed unless it clearly appears that no relief can be granted under any set of facts that could be proved consistently with the plaintiff's allegations." *Id.* (citing, *inter alia, Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)). Whether a plaintiff will ultimately prevail is not a consideration for review of a motion under Rule 12(b)(6). *Nami* at 65.

## II. STATEMENT OF FACTS ALLEGED IN THE COMPLAINT

According to the complaint, Saxe and his children attended the "Winter Holiday" program sponsored by SCASD at the Corl Street Elementary School. On entering the school, Saxe (and most other attendees) passed a table displaying a Menorah and a Kwanzaa candelabra. Overhead was a banner which read, "Happy Holidays." There also were three books on the table: one about Chanukah, or the "Festival of Lights"; a book about Kwanzaa; and a book entitled "Celebrations" which appeared to be a comparative study of holiday expressions. The table contained no other religious symbols or books.

The program itself began with secular songs of the season. None of these songs made reference to Christian symbols or doctrine. In fact, one of the songs was a parody of a traditional Christian hymn, with the lyrics changed to a flippant account of "Christmas at the Mall." Saxe found the parody offensive.

The program also included a presentation of Chanukah as a miraculous burning of "religiously-dedicated"[2] oil lamps while "priests of Judaism" held off a siege of the Second Temple. The festival was presented through song as a sacred, serious, and religious event.

The official program then turned to a celebration of Kwanzaa, a religious holiday of recent origin which includes prayers and candle lighting services.[3] The program included beating drums while attendees were encouraged to join in a chant of "Celebrate Kwanza."[4]

The lyrics of songs conveying the essence and tenets of Chanukah and Kwanzaa were projected onto the walls of the school. The program closed with a chorus of "Shalom," and those in attendance were encouraged to sing the lyrics. While the program encouraged participation in rituals related to Chanukah and Kwanzaa, there was no such encouragement to participate in rituals relating to Christian Christmas. In contrast to Chanukah and Kwanzaa, Christian Christmas was presented as a celebration unworthy of respect.

## III. CONSIDERATION OF EVIDENCE

Before turning to the merits of Saxe's claims, it is necessary to address the matter of evidence submitted to the court for consideration. An affidavit submitted by

---

2. Sic. May mean "religiously decorated."

3. Whether Kwanzaa, an African–American holiday patterned after African harvest festivals, is celebrated as a religious event is a debatable point. While Saxe provides information from an Internet web site which so indicates, Exhibit F to Plaintiff Saxe's Second Affidavit, the on-line version of the Encyclopedia Britannica indicates that the holiday is "a nonreligious celebration of family and social values." *See http //www.britannica.com/ bcom/eb/ article/7/ 0,5716,47637 + 1 + 46553,00. htm.?query=kwanzaa.* For present purposes, we presume that Saxe is correct in characterizing Kwanzaa as a religious festival.

4. Kwanza is an alternate spelling of Kwanzaa.

defendants concerning the display inside the Corl Street school has been withdrawn. In effect, it has been replaced by Saxe's second affidavit because photographs of the display, or at least most of the display, are appended.

■ The general rule is that only allegations of the complaint, exhibits attached to the complaint, and matters of public record are considered on a motion to dismiss. *Pension Benefit Guaranty Corp. v. White Consolidated Industries, Inc.*, 998 F.2d 1192, 1196 (3d Cir.1993), *cert. denied*, 510 U.S. 1042, 114 S.Ct. 687, 126 L.Ed.2d 655 (1994). However, a document appended to the defendant's motion to dismiss may be considered if it is concededly authentic and the complaint is based on the document, thereby preventing a plaintiff from avoiding proper dismissal by simply failing to attach to the complaint a dispositive document on which it relied. *Id.*

The parties agree that the photographs appended to Saxe's second affidavit are an accurate depiction of the items displayed on the table in the Corl Street Elementary School when Saxe attended the Winter Holiday program. Presumably, Saxe could have attached the photographs to his complaint (although the usual type of document considered in this context would be something like a contract document). We therefore have no trouble concluding that we may consider the photographs.

■ Less clear is our consideration of the items themselves, most of which have been provided to the court by defendants. This seems more like consideration of evidence extraneous to the complaint. However, the rule requiring the court to con-

vert a motion to dismiss to a motion for summary judgment when extraneous matter is considered is based on the need to allow the plaintiff to respond to the defendant's submission. *Id.* The exception for documents relied upon in the complaint is acceptable because the need to refute the evidence is greatly diminished. *Id.* at 1196–1197. Given that Saxe has stipulated to the authenticity of the items submitted, subject to the exceptions discussed below, the need for a response is not only greatly diminished, but is nonexistent. We therefore conclude that we may consider the items submitted, at least those to which Saxe has conceded the authenticity and accuracy, in the context of the motion to dismiss without converting it to a motion for summary judgment.

The display at issue, therefore, consisted of the following arranged on a small table:

1. A book entitled *Celebrations.*
2. A book entitled *My Harvest Home.*
3. A book entitled *Festival of Lights.*
4. A small pouch of gold coins.
5. A Menorah.
6. A Kwanzaa candelabra.
7. A Kwanzaa cloth.
8. A card with the work "Oplatki" on it.
9. A dreidle.
10. A red and white cloth.
11. Incense in an incense holder.
12. A book about Kwanzaa.
13. A white, cut-out snowflake.

Stipulation at 2 ¶ b. Saxe's photographs also show the item denominated a "giving tree." In the photograph, the tree is undecorated, but previously had been adorned with hats, gloves, and doves.[5] Saxe's Second Affidavit at 2 ¶ 4. It plainly was larger than the table, though the parties disagree as to its exact size.

---

5. Both parties describe the tree and decorations as secular in nature. Of course, an evergreen tree also is an emblem of Christmas, and a dove is a symbol commonly used by Christians as an emblem for the Holy Spirit or Holy Ghost. THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 589 (2d ed.1987); Matthew 3:16–17; Mark 1:9–12; Luke 4:21–22. A dove has become a universal sign of peace, particularly in conjunction with an olive branch. That symbol derives

from the cleansing of the earth from wickedness and violence by the Great Flood. *See esp.* Genesis 8:8–12 (Noah sent a dove to see if the flood waters have receded, and it returned with an olive branch; later, when the dove did not return, Noah knew that the Earth was dry). The tree and decorations need not be viewed as necessarily or completely secular, particularly when they are viewed together.

The parties also disagree concerning the size, description and placement of a banner reading "Happy Holidays" over the display. Defendants contend that such a banner was hung over the table, but Saxe disagrees. It is not clear from the stipulation whether Saxe denies the existence of such a banner in its entirety or if he merely believes it was smaller or placed elsewhere than as described by defendants. The second photograph in the series provided by Saxe shows some sort of wall-hanging which appears to be blue and green with a white border above the table displaying the books, Menorah, etc. However, we are unable to discern whether that item is the disputed banner, nor its precise dimensions.

The portion of defendants' reply brief about which Saxe complains requests that we strike other exhibits appended to Saxe's second affidavit. Both parties misuse the word strike. The question is the importance to be attributed to certain items. Regardless of the weight we give an exhibit, if any, we see no purpose to striking the exhibits from the record. *See generally Bristol–Myers Squibb Co. v. Ivax Corp.*, 77 F.Supp.2d 606, 619 (D.N.J. 2000) (rule governing motions to strike relates to pleadings; such motions are granted only to simplify the proceedings and prevent prejudice, are disfavored, and are not a vehicle to determine disputed questions of law or fact).

Regardless of Saxe's additional exhibits, the significance of some of the items are established by the items themselves. The Jewish festival of Chanukah celebrates the victory of the Maccabees over soldiers of the king of Judea and restoration of the Temple. The celebration lasts eight days. The Menorah has at least eight candles, one to be lit on each day. There may be a ninth candle, which is used to light the others. The Menorah commemorates the miraculous burning of lamps throughout the first Chanukah, in which it is said that there was only enough oil to burn for one day. *See* MAIDA SILVERMAN, FESTIVAL OF LIGHTS: THE STORY OF HANUKKAH (1987) (Defendants' Appendix 2).[6]

It is not entirely clear why defendants challenge the documents describing Kwanzaa, since their own briefs discuss inclusion of symbols of that festival in the display.[7] Regardless, while we think we might take judicial notice of Kwanzaa's nature as an African–American holiday of recent origin, we believe the allegations of the complaint suffice. *See* Complaint at 4–5 ¶¶ 18–20.

The book *My Harvest Home* which was included in the display relates to Polish culture. ANDREA SCHAFER, MY HARVEST HOME: A CELEBRATION OF POLISH SONGS, DANCES, GAMES AND CUSTOMS (1995) (Defendants' Appendix 3). In a short summary of Poland's history, the author emphasizes the influence of Christianity and particularly Roman Catholicism, as evidenced by the fact that the current Pope is Polish. *Id.* at 11–12. References to religious celebrations appear throughout the book, including a Christmas carol. *Id.* at 42–43. *See also id.* at 26–27 (song about a clergyman entitled "Father Virgilius"), 40 (describing Polish Christmas traditions), 57 (harvest celebration in church).

---

**6.** The story of the Maccabees is recited in four books (I, II, III, and IV Maccabees) which appear in some manuscripts of the Septuagint, the original translation of the Old Testament from Hebrew to Greek. The canonical Septuagint contains only I Maccabees and II Maccabees, as does the Vulgate (Saint Jerome's Latin translation of the Septuagint) and the Apocrypha. The former two translations are used by Roman Catholics and Eastern Orthodox Christians, while the latter is used by Protestants. *http:// encarta.msn. com/index/ conciseindex/ 4F/ 04f74000.htm? z=1 & pg=2 & br=1; http:// www. britannica. com/bcom/eb/ article/2/ 0,5716,- 50832 + 1 + 49632, 00.html? query=maccabees; http:// www.britannica.com /bcom/ article/1/ 0,5716,68531 + 1 + 66805, 00.html? query + septuagint; http: //www. britannica.com/bcom/eb/ article/1/ 0,5716,77781 + 1 75790,00.html? query=vulgate.*

**7.** The book on Kwanzaa is not with the items submitted to the court.

The book *Celebrations!* is a comparative study of both secular and religious customs and celebrations from different areas of the world, demonstrated through children from different countries. ANABEL KINDERS-LEY, CELEBRATIONS!: FESTIVALS, CARNIVALS, AND FEAST DAYS FROM AROUND THE WORLD (1997).[8] The central figure on the cover of the book is a girl dressed in a white robe or dress with a red sash tied in a bow around her waist, with her hands arranged as for Christian-style prayer. Inside the book, this girl is pictured on a page dedicated to describing the Swedish festival of Saint Lucia. *Id.* at 55. At the left is a picture of a boy reaching into a plastic bag. The same boy is pictured on a page describing the feast of Saint Nicholas in Slovakia. *Id.* at 54. Also pictured is a small boy holding a sugar cross, with an older boy behind him. The same boys appear on pages describing the Mexican celebration of The Day of the Dead (El Día de los Muertos).[9] *Id.* at 44–45.

Also included within the book are pages on Mother's Day in England (described as a Christian festival falling on the fourth Sunday in Lent and a time to relax the rigid rules of Lent; special church services are a part of the day), Thanksgiving in North America (described as a day early settlers "gave thanks to God"), Christmas in Germany (Christmas is described as "a Christian festival to mark the birth of Jesus Christ") and Epiphany, or Three Kings' Day, in Spain. *Id.* at 20, 46–47, 56–57, 58–59.

In sum, then, the table display included several items associated with Chanukah, a book on various celebrations throughout the world (including several Christian celebrations), a book on Polish culture reflect-ing Christian influence, and several items associated with Kwanzaa. The table is covered by a red cloth with white trim which, while described in the stipulation as a "red and white cloth without any ornaments or bells," is easily recognizable as a tree skirt. Next to the table is an artificial evergreen tree which, while described as a "Giving Tree," is easily recognizable as a variation of a Christmas tree.

As described below, analysis under the Establishment Clause is fact-driven, with context an important part of the analysis. We therefore describe, to the extent feasible, the rest of the context, which consisted of the "official program."

This part of our examination is more difficult because Saxe has not stipulated to the collection of songs provided by defendants (Appendix 10), which they contend are the song sheets for the entirety of the program. It is not clear whether Saxe believes that there were more songs, that some of these songs were not part of the program, or that there were songs sung in place of these.

One point that is clear is that the "parody of the Christian faith" to which Saxe refers in his complaint is one of the sets of lyrics provided. *See* Appendix 10 at 15 (lyrics to "Bruno's Christmas at the Mall"). A note at the top of the first page reads, "Lyrics to melody Good King W." We read the note as indicating that the lyrics are sung to the tune of "Good King Wenceslas," traditionally sung during the Christmas season. Saxe describes the song as a change "from a celebration of the birth of the Christ Child to a flippant account of 'Christmas at the Mall.'"[10]

---

8. Some of the royalties from the sale of this book are paid to the United Nations Children's Fund (UNICEF), *id.* at 2, supporting a characterization of the book as cross-cultural. Of the books displayed and which have been provided to the court, this is the only one which appears to have been owned by SCASD. *Id.* at 1 (page stamped, "CORL STREET LIBRARY, STATE COLLEGE AREA SCHOOLS"). My Harvest Home is un-marked, and Festival of Lights has "Emma Cusumano, Corl Street School, Ms. Wolfe, rm. 24" hand-printed on the first page.

9. This festival corresponds to All Saints Day and All Souls Day celebrated elsewhere on November 1 and 2, respectively, which also are described as Christian celebrations. *Id.* at 63.

Unfortunately, apart from the song parody, we are not told much by Saxe as to what else made up the official program. According to the complaint, the program began with the singing of secular songs of the season, including the parody. Complaint at 4 ¶¶ 13–14. Saxe also states that the official program "included a presentation of Chanukah ...," *id.* at 4 ¶ 15, and continues:

> The official program presented Chanukah as a miraculous burning of religiously-dedicated [sic] oil lamps while priests of Judaism held off a siege of the Second Temple. This religious festival was presented through song, which was performed as a sacred, serious and religious event, in keeping with the spirit of the festival of lights.

Complaint at 4 ¶ 17. What we cannot glean from these allegations is what exactly occurred. The foregoing may be read as indicating that the program included a play, skit, or other reenactment of the historical/miraculous events which are commemorated in Chanukah (if so, a reenactment as described would be inaccurate). In context, the complaint also may be read as indicating that certain songs relating to Chanukah were sung, and the quoted paragraph is simply an explanation of the religious significance of Chanukah for the court's benefit.

So that the court may address the motion to dismiss without unnecessary delay, particularly given the filing of the motion for a preliminary injunction, we will read the complaint in the manner which seems to us most reasonable: The program included songs relating to Chanukah but not any kind of play. We read the complaint

in this manner because it nowhere indicates clearly that anything except singing was part of the official program. In addition, the complaint states that the aspect of the program relating to Kwanzaa consisted of the beating of drums along with a chant of "Celebrate Kwanza." Complaint at 4 ¶ 19. Interspersed among these songs were various secular songs of the Christmas season.

While we do not rely on Exhibit 10, we note that the song book is consistent with this reading of the complaint. It begins with a song called "Do–Di–Li," to which one would dance the hora and which is sung in conjunction with Chanukah. What follow are various secular songs about Christmas (such as "Rockin Around the Christmas Tree," "Frosty the Snowman," and "Rudolph" (the Red–Nosed Reindeer)), about winter ("A Perfect Winter Day," "The Little Snowflake"), or miscellaneous topics ("Big Dreams," "Favorite Things"). Included is a single song about Kwanzaa, consisting of chanting "Kwanza. Kwanza. Celebrate Kwanza." Exhibit 10 at 5. The last song is called "Shalom," and consists of singing that word, interspersed with "May peace be with you, my friend, my friend" or "May peace come to you." Exhibit 10 at 29. No other Chanukah or Kwanzaa song is included.

To the extent such may be useful, the totals for the subjects of songs are: 2 Chanukah, 1 Kwanzaa, 8 Christmas (including "Winter Wonderland," which also may be viewed as not necessarily a Christmas carol), and 7 "other." The complaint is consistent with Exhibit 10 in that its description of the official program includes only the "Shalom" and "Celebrate Kwanza" chants as specific examples of music

---

**10.** Actually, "Good King Wenceslas" is about a king who sees a poor man collecting fuel for his fire on a cold night. The king takes pity on the man and carries "flesh," wine, and pine logs to the poor man's home. The event occurs on the "Feast of Stephen," or December 26. Saint Stephen is considered the first Christian martyr. His story is told in the Acts of the Apostles, Chapters 6 through 8. *http://* *ww.brokenclaw.com/ carols/ GoodKing.txt;* *http:// www. britannica.com/ bcom/eb/article/1/ 0,5716,71411 + 1 + 69061,00. html? query= saintŝtephen.* Presumably, the song has become a staple of the Christmas season due to the proximity of the feast to Christmas day and because the song reflects the spirit of giving associated with the season.

dedicated to Chanukah andKwanzaa. However, inclusion of "Do–Di–Li" is consistent with the paragraph of the complaint quoted above. Also, the complaint alleges that secular songs of the Christmas season were sung, which is consistent with Exhibit 10.

In addition to the table display described above, then, we read the complaint as alleging that the song program included a song like "Do–Di–Li," if not "Do–Di–Li" itself. A number of other songs were sung, including the Kwanzaa chant and the song parody, as well as various other songs appropriate to the time of year, though not oriented to Christianity. The program ended with "Shalom."

Succinctly stated, Saxe's claim is that the table display and song program violated the First Amendment because they were not Christian enough. We turn to the most recent pronouncements of the law in this area.

## IV. ESTABLISHMENT CLAUSE

The First Amendment reads in part, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; . . ." U.S. CONST. amend. I. The First Amendment is applicable to the states through the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). Saxe does not claim that any conduct by defendants prohibited his free exercise of religion, and so we limit our analysis to the Establishment Clause.

In *ACLU of New Jersey ex rel. Lander v. Schundler*, 168 F.3d 92 (3d Cir.1999), the Court of Appeals for the Third Circuit analyzed the Supreme Court's most recent Establishment Clause pronouncements, reached through fractured majorities, for the opinion which would support the Court's position on the narrowest grounds. *See esp. id.* at 103 (citing, *inter alia, Marks v. United States*, 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977)). Each decision relates to municipal holiday displays. *Schundler* therefore guides and controls our analysis.

The two Supreme Court opinions to be examined were *County of Allegheny v. ACLU, Greater Pittsburgh Chapter*, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989), and *Lynch v. Donnelly*, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984). The earlier of the two cases, *Lynch*, involved a holiday display in a park in the City of Pawtucket, Rhode Island. The City did not own the park but owned the items displayed. Most of them were secular symbols of Christmas, such as a Santa Claus house, Christmas tree, etc., but a crèche also was displayed. *Schundler* at 99.

Chief Justice Burger wrote for a four-Justice plurality of the Court and applied the "*Lemon* test," so called for *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).[11] He opined that the display had a legitimate secular purpose because it simply took note of a "significant historical religious event long celebrated in the Western World." *Schundler*

11. In *Mitchell v. Helms*, 530 U.S. 793, 120 S.Ct. 2530, 2540, 147 L.Ed.2d 660 (2000) (plurality opinion), the Supreme Court recognized that *Lemon* has been modified, that subsequent cases had "pared" factors which may justify a finding of excessive entanglement, and that certain other opinions no longer are good law. *See also Mitchell* at 2556 (O'Connor, J., concurring; agreeing that case modifying *Lemon* controlled and agreeing with overruling of other cases). A majority of the Court therefore agreed that *Lemon* has been modified from the form applied by Chief Justice Burger in *Lynch*. Justice Scalia, joined by Chief Justice Rehnquist and Justice Thomas, recently dissented from a denial of certiorari because he wanted "to take the opportunity to inter the *Lemon* test once and for all." *Tangipahoa Parish Board of Educ. v. Freiler*, —— U.S. ——, ——, 120 S.Ct. 2706, 2708, 147 L.Ed.2d 974 (2000) (also noting that majority of Court had expressed same view). Based on *Schundler*, the original *Lemon* test does not apply, and its continuing viability even in modified form is questionable. Of course, the specific test we apply is dictated by *Schundler*.

at 100 (quoting *Lynch* at 680–681, 104 S.Ct. 1355). The display did not have the principal or primary effect of advancing religion, since the aid to a particular religion could not be said to be greater than other governmental activities previously approved by the Court. *Id.* (quoting *Lynch* at 683, 104 S.Ct. 1355). Finally, there was no excessive entanglement because the City was not involved with church authorities regarding the content of the display, and the cost was small. *Id.* (quoting *Lynch* at 684, 104 S.Ct. 1355). Chief Justice Burger also emphasized that "political divisiveness" was not a basis for finding the display invalid, especially since the only evidence of political divisiveness was the lawsuit itself. *Id.* (quoting *Lynch* at 684–685, 104 S.Ct. 1355).

Justice O'Connor joined the opinion of the Court and cast the deciding fifth vote to uphold the constitutionality of the display, but wrote a concurring opinion suggesting the need for clarification of Establishment Clause doctrine. In her view, government can violate the Establishment Clause in one of two ways: (1) by becoming excessively entangled with religious institutions; and (2) by endorsing or disapproving of religion. *Id.* (quoting *Lynch* at 687–688, 104 S.Ct. 1355). She found no institutional entanglement nor did she find that political divisiveness had any relevance to the analysis. The only question was whether the City had endorsed Christianity through the display. *Id.* (quoting *Lynch* at 689–690, 104 S.Ct. 1355). That question was to be answered by examining what the City intended to convey and what message actually was conveyed. *Id.* at 100–101 (quoting *Lynch* at 691, 104 S.Ct. 1355).

Turning to the display at issue, Justice O'Connor found that the City's purpose was to celebrate a public holiday through traditional symbols. Because there is cultural significance in addition to the religious aspects, there was a legitimate secular purpose to the display. *Id.* at 101 (quoting *Lynch* at 691, 104 S.Ct. 1355).

Also, while the religious significance of the crèche was not neutralized by the setting, the overall holiday setting changed what viewers would perceive about the inclusion. That is, the "typical museum setting" negated any message of endorsement of the religious content, and communicated only that government was celebrating the holiday's "secular components and traditions." *Id.* (quoting *Lynch* at 692, 104 S.Ct. 1355).

In contrast, four dissenters found that the display did not have a secular purpose, that inclusion of the crèche placed a government imprimatur on particular religious beliefs, and posed a significant threat of fostering excessive entanglement. *Id.* (quoting *Lynch* at 698–702, 104 S.Ct. 1355; Brennan, J., dissenting).

Later, in *County of Allegheny,* the Supreme Court examined two displays on public property in downtown Pittsburgh. The first was a crèche, banner ("Gloria in Excelsis Deo!"), poinsettias, decorated evergreen, and a plaque indicating that the display had been donated by the Holy Name Society, a Roman Catholic group. This display was placed on the grand staircase of the county courthouse. No figures of Santa Claus or other figures clearly recognizable as secular appeared in the display. *Schundler* at 101 (quoting *County of Allegheny* at 579–581, 109 S.Ct. 3086). The four *Lynch* dissenters and Justice O'Connor held that the display violated the Establishment Clause. *Id.*

Justice Blackmun wrote for the Court and held that the display crossed the line demarcated in *Lynch.* Simply put, the overall effect of the display was to convey an endorsement of the religious content. The floral decorations surrounding the crèche did not have the effect of negating the message of endorsement. *Id.* at 101–102 (quoting *County of Allegheny* at 598–602, 109 S.Ct. 3086).

Justice O'Connor wrote a concurring opinion which distinguished *Lynch* in the same way. She found that, because the crèche was not part of a broader display

and was not in a private park in a commercial district, the context conveyed a message of endorsement. *Id.* (quoting *County of Allegheny* at 627, 109 S.Ct. 3086).

Three of the *Lynch* dissenters opined that any display of religious symbols on government property necessarily sends a message of government endorsement of religion. Four Justices dissented from the holding in *County of Allegheny,* and would have upheld the courthouse display. *Schundler* at 102.

The second display at issue in *County of Allegheny* was placed in front of the City–County Building, the functional equivalent of a city hall. The display included a decorated, 45–foot Christmas tree; an 18–foot Menorah owned by a Jewish group but erected, removed, and stored each year by the City; and a sign which read, "During this holiday season, the city of Pittsburgh salutes liberty. Let these festive lights remind us that we are keepers of the flame of liberty and our legacy of freedom." *Schundler* at 102 (quoting *County of Allegheny* at 582, 587, 109 S.Ct. 3086).

Justice Kennedy wrote for four members of the Court, holding that the display did not violate the Establishment Clause because it was noncoercive and did not give direct benefit to religion to the extent that there was an establishment, or tendency toward establishment, of religion. Government may participate to some degree in celebrating a holiday with religious origins and, in fact, failing to display any religious symbols in such a context would convey a message of hostility toward religion. *Id.* (citing *County of Allegheny* at 663–667, 109 S.Ct. 3086).

Justice Blackmun wrote that the display represented a celebration of both Christmas and Chanukah as secular holidays. He decided that the Christmas tree was a secular symbol and that the Menorah was acceptable in that context because there is no similarly secular symbol of Chanukah. The sign supported this view, since the theme of light was common to both Christ-

mas and Chanukah as winter festivals. *Id.* at 102–103 (citing *County of Allegheny* at 615–619, 109 S.Ct. 3086).

Justice O'Connor wrote a separate opinion agreeing that the overall effect of the display was not to endorse religion but to salute liberty and freedom to choose one's own beliefs. *Id.* at 103. She agreed that the tree was a secular symbol but found the Menorah to be religious in nature. However, display of the Menorah did not convey endorsement of Judaism religion generally, but conveyed a message of pluralism and freedom of belief during the holiday season. *Id.* (quoting *County of Allegheny* at 635, 109 S.Ct. 3086). Moreover, because winter holiday season is celebrated in diverse ways, there was no message endorsing religion over non-religion, but a message of diversity and tolerance. *Id.* (quoting *County of Allegheny* at 635–636, 109 S.Ct. 3086).

Three dissenters from this holding held the same view as they held of the crèche on the grand staircase of the courthouse; that is, it included religious symbols on public property and therefore necessarily conveyed a message of endorsement. *Id.* at 103 n. 9.

The Third Circuit determined that the opinion expressing the narrowest grounds supporting the majority position in *County of Allegheny* was that of Justice O'Connor. *Id.* at 103–104. However, it turned first to an examination of the display at issue under the teachings of *Lynch.* At issue before the Third Circuit was a "modified display" in Jersey City, New Jersey. The display was modified in response to the filing of suit by the ACLU, *Schundler* at 95, and the original display (which was found to violate the Establishment Clause) is not material for present purposes except as it was included in the modified display.

Originally, the display included a crèche (which measured 11'9"x7'x4'4") and a Menorah (19'x14'). A 13' Christmas tree was part of the display but was not considered by the district court. Part of the problem

was that the crèche and Menorah were not displayed together because a calendar anomaly led to an early celebration of Chanukah in 1994. In 1995, the display was modified to include secular symbols (Santa Claus and Frosty the Snowman) as well as Kwanzaa symbols on the tree. Two signs stating that Jersey City intended to celebrate the cultural diversity of its citizens also were placed with the display. *Id.* at 95–96.

The Third Circuit found that the modified display could not be distinguished in any constitutionally significant way from the display upheld in *Lynch*. Rather, it found that the combination of secular and religious symbols (so that the religious symbols were not a focal point of the display), along with the signs indicating the intent to celebrate a cultural event and not to endorse religion, allowed the display to pass constitutional muster. *Id.* at 104. The Third Circuit then rejected an argument by the dissent that the size of the religious symbols rendered them a more significant part of the display than those at issue in *Lynch* by pointing out that a single secular symbol was found sufficient in *County of Allegheny*. *Schundler* at 104–105.

In this context, the Third Circuit pointed out that even the plaintiffs decided this "fruitless exercise" as an attempt to determine "how many candy canes offset one Jesus?" *Id.* at 105 (quoting Plaintiffs'/Appellees' Brief at 15; internal quotations omitted). The Third Circuit also rejected the argument that the City's prior history of violating the Establishment Clause (in the original display) showed an intent to endorse religion or otherwise to act in bad faith. Rather, that history would show only that the City had failed to comport with the fine line-drawing involved without specific guidance. *Id.* Implied in this reasoning is acceptance of the City's apparent attempt to comply with the Establishment Clause by modifying the display.

The Third Circuit then applied *County of Allegheny* and distinguished the display

in the courthouse because no secular message of cultural diversity and tolerance was conveyed. *Schundler* at 105 (quoting *County of Allegheny* at 636, 109 S.Ct. 3086). In contrast, Jersey City's display conveyed that message explicitly in the signs and implicitly through the nonverbal symbols. *Id.* at 106. The court then examined the symbols, in number and significance, and found that the message conveyed by the display in Jersey City was roughly equivalent. That is, there were both secular and religious symbols, and there appears to have been a rough balance between them. *Id.*

Further, the displays in *Schundler* and *County of Allegheny* were both on public property. While that fact has some significance to the analysis, it is not determinative. *Id.* Finally, there was a long history of displays like that used by Jersey City in many places. History and ubiquity are relevant as part of the context in which a reasonable observer evaluates the message conveyed by a holiday display. *Id.* at 106–107.

Given all of these factors, the Third Circuit concluded that the message conveyed by the Jersey City display was one of pluralism and freedom of choice rather than endorsement of religion. In the end, the Jersey City display simply was not distinguishable in any constitutionally significant way from those approved by the Supreme Court in *Lynch* and *County of Allegheny*. Those opinions therefore compelled the outcome reached in *Schundler*. *Id.* at 107. The remainder of the majority opinion explains why the dissent's arguments were rejected and why some of the prior panel's reasoning (in an opinion dealing with the original display) was rejected. *Id.* at 107–109.

Also important for present purposes is the following:

> If we follow *Lynch* and *Allegheny County*, we have no alternative but to reverse the permanent injunction insofar as it enjoins Jersey City from erecting the

modified display "or any substantially similar scene or display in the vicinity of the entrance to the City of Jersey City's City Hall." Indeed, even if we were persuaded that the modified display itself was unconstitutional, we could not possibly approve an injunction against "any substantially similar scene or display." Both the Pawtucket display and the display in front of the City–County Building in Pittsburgh were, at the least, "substantially similar" to the modified Jersey City display, and consequently the District Court's injunction had the obviously improper effect of enjoining displays that are identical to ones that have passed the Supreme Court's scrutiny.

*Schundler* at 107. In other words, a municipality's failure to discern the proper boundary lines of the Establishment Clause is not a basis for enjoining it from trying to stay within those boundaries in the future.

### V. APPLICATION

Saxe does not allege, and nothing else in this record suggests, that the Winter Holiday program caused, or possibly could cause, excessive entanglement with religion by SCASD. That is, there is no indication that any clergy were involved in the planning or administration of the program, nor is SCASD involved in any doctrinal questions. We conclude easily that the first of the ways government may run afoul of the Establishment Clause noted by Justice O'Connor, excessive entanglement with religious institutions, is not at issue.

Another point which we do not believe impacts our decision to any substantial extent is the location of the Winter Holiday program and display. The parties have addressed the question of our analysis as it applies in the public school setting. The concerns implicated in cases addressing such matters as prayer in a classroom or at a high school commencement involve the impact of such activities by persons with an apparent official sanction on children of tender years or teenagers, both of whom may be uniquely sensitive to such matters.

However, Saxe is not a public school student and has sued only on his own behalf. His complaint is about a holiday display on public property. While the inside of a school auditorium or multipurpose room may not be the same in terms of exposure as a courthouse or city hall, or even a privately owned park, the public was invited into the school on the occasion in question and would have been exposed to whatever message was to be conveyed by the display and the song program. We therefore conclude that the appropriate analysis is that applied in *Lynch, County of Allegheny,* and *Schundler.*

In this context, we think it important to distinguish *Santa Fe Independent School District v. Doe,* 530 U.S. 290, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000), in which a clear majority of the Supreme Court (six Justices) held that a school district's policy of allowing an invocation before football games by an individual student elected from among the student body violated the Establishment Clause of the First Amendment. The district's participation in the election had the effect of endorsing the views expressed by the speaker, or at least a reasonable observer would so conclude, and the election process meant that the majority view would be expressed. *See esp. id.* at 2278 ("In this context the members of the listening audience must perceive the pregame message as a public expression of the views of the majority of the student body delivered with the approval of the school administration"). In contrast, the Supreme Court has concluded that holiday displays such as the one at issue in this case send a different message, which is secular and legitimate.

The questioned display plainly begins with the "Happy Holidays" sign, regardless of its precise dimensions or location. In conjunction with the "Giving Tree" and the emblems of Chanukah and Kwanzaa, there is plainly an intent to convey an

inclusive message of celebration, hardly a surprising message for the Winter Holiday program. A member of the public passing this display is on the way to the multipurpose room for the song program, which provides further context. Included in the program were a number of secular Christmas carols, along with songs relating to winter and songs with no consistent theme. Two songs relating to Chanukah were included, and a single chant relating to Kwanzaa.

The primary difference between the Winter Holiday program and the displays found to comply with the Establishment Clause discussed above is that there was no sign specifying an intent to celebrate diversity and freedom to choose one's own beliefs. We believe that this message is implicit, however, in a display and song program representing the customs of several ethnic and religious groups with a subtext of celebration.

As we have said, the thrust of Saxe's complaint is that the Winter Holiday program was not "Christian enough." This thrust is reflected in his claim that Judaism and some unspecified African–American religion were emphasized while Christianity was under-emphasized or ignored. As Justice Blackmun and Justice O'Connor pointed out in *County of Allegheny,* there is no secular symbol of Chanukah which could be used in the same way that a Christmas tree was used in the display at issue. It must be said, then, that any display celebrating Chanukah will necessarily have more symbols, numerically, of purely religious significance. However, the holding of *County of Allegheny* demonstrates that this fact alone does not mean that any such display, in conjunction with symbols of Christmas or other holidays, shows favoritism of constitutional moment.

We return, then, to the Third Circuit's comments on this analysis, which demonstrate a rejection of the argument that we somehow tally up points for religious symbols versus secular symbols. We also choose not to decide how many candy canes offset one Jesus. The fact is that there were symbols of Christmas displayed and the song program included Christmas carols. No particular faith was preferred at the expense of others, and a reasonable observer would not so conclude.

Saxe also claims that the display demonstrates hostility toward the Christian religion. He points to the lack of symbols with a specific religious connotation and to the absence of Christmas carols with content of a religious nature. This argument is refuted by Justice O'Connor's opinion in *County of Allegheny,* in which the display included only a Menorah, Christmas tree, and sign. Justice O'Connor specifically identified the tree as a secular symbol but found that the display did not endorse Judaism or religion generally. Implicit in such a conclusion is a finding that there need not be symbols of other religions to counterbalance something like a Menorah before the message is reasonably perceived as one of inclusion. Christians would be among those who celebrate Christmas (hardly a stretch in reasoning),[12] and so would be included for purposes of the message through display of the Christmas tree.

To this we would add that Justice Kennedy's concern in *County of Allegheny* that failing to include religious symbols in a celebration with religious origins may be perceived as hostility toward religion does not apply. As we have described, a number of the symbols used are ambiguous and may be perceived as either religious or secular. For example, the Christmas tree (despite being called a "Giving Tree") and the doves plainly have religious connotations in addition to their secular meaning. Moreover, the girl praying while dressed for the festival of Saint Lucia has only

---

**12.** *Cf. County of Allegheny* at 662, 109 S.Ct. 3086 (opinion of Kennedy, J.; noting origin of Christmas as "Christ's Mass").

religious connotations. While symbols which plainly are Christian in nature may be in the minority numerically, they are not excluded and, when taken in combination with the secular and ambiguous symbols of Christmas and the songs included in the official program, no hostility toward Christianity is demonstrated.[13]

Finally, we turn to the song parody which Saxe claims was offensive and hostile toward Christianity. As noted, the lyrics were sung to the melody of "Good King Wenceslas." The song tells the story of children taken to a mall by their grandmother. They separate while she does her shopping, and she forgets them. When the mall closes, the children are still inside. They therefore have the freedom to roam the mall, playing musical instruments, riding pedal cars, etc.

We fail to see how this song demonstrates hostility toward Christianity. It is a song about a humorous event which most children would enjoy having happen to them sung to a familiar tune. This song is consistent with the remainder of the songs, which are simple, upbeat, and otherwise generally appropriate for children to sing. The use of a particular tune does not support a conclusion that there is an intent to belittle the song from which the tune is borrowed. In fact, borrowing a tune would be the easiest way of teaching children to sing new lyrics. There is nothing in the content of the parody which refers in any way to the story of King Wenceslas, nor is there any way in which the spirit of giving is belittled. We recognize that Christmas is a time of serious commemoration, but it is also a festive time. This song is about nothing more than children having fun during the Christmas season,

and a reasonable listener would not find that offensive.

Recently, U.S. Magistrate Judge Peck of the Southern District of New York was presented with a problem similar to that we face. A *pro se* plaintiff sued under Title VII and the First Amendment based on holiday symbols displayed in a VA hospital. The display included Menorahs and "Happy Hannukah" signs along with toy soldiers, Christmas trees, Santa Clauses, posters celebrating Kwanzaa, and signs mentioning Muslim prayer services. In addition, a memorandum explaining the decorations policy stated that religious symbols were acceptable only as part of larger displays of secular symbols. *Spohn v. West,* No. 00 CIV. 0735 AJP, 2000 WL 1459981, at *1–2 (S.D.N.Y. Oct.2, 2000).

Magistrate Judge Peck reviewed the law of holiday displays in a manner consistent with the above, *id.* at *2–3, and concluded that the plaintiff had not alleged that a reasonable observer would perceive the display as a governmental endorsement of Judaism. *Id.* at *3. In fact, the documentation accompanying the complaint showed that there were secular symbols throughout the hospital, "facts which would weigh against a finding that the Center's holiday display violated the Establishment Clause." *Id.* The complaint therefore was dismissed without prejudice to the plaintiff's right to file an amended complaint which provided a description of the displays "sufficient to show their unconstitutionality under the Supreme Court's Establishment Clause cases discussed above." *Id.* at *4. Also emphasized was the fact that the hospital was not required to display a crèche, the removal of which was

---

**13.** We think a reasonable viewer/listener attending the Winter Holiday program would have the opposite impression: SCASD feared a lawsuit by non-Christians and therefore toned down overtly religious symbols of Christmas. Reading *Schundler,* one might view this as an overreaction, since governmental entities apparently have some leeway to include religious symbols in holiday displays. Given the splintered majorities in the Supreme Court opinions, however, which leads one to conclude that the law is less than clear in this area (reading, much less understanding and reconciling, the various opinions itself is a task to daunt the most intrepid of government officials), the reaction seems more reasonable.

the plaintiff's primary complaint, and could not be ordered to do so. *Id.*[14]

In addition to all of the foregoing, we note that both in the complaint and in his affidavit, Saxe refers to his own feelings about being offended and the educational value of the Winter Holidays program. Neither has any relevance to an objective test relating to the message conveyed.

## VI. CONCLUSION

■ The holiday display and song program at the Corl Street School are consistent with applicable Supreme Court and Third Circuit precedent which establishes that such a display sends a message of inclusion and celebrates freedom to choose one's own beliefs. Since this message does not offend the Establishment Clause, either as favoring one religion over others or as favoring religion over non-religion, the governmental entity is conveying a legitimate, secular message. We find no principled way to distinguish the overall message sent by the Winter Holiday program from displays found acceptable in *Lynch, County of Allegheny,* and *Schundler.* We also find that the program is consistent with these principles as applied in *Spohn.*

We further agree with the court in *Spohn* that Saxe should be given an opportunity to amend his complaint to allege a violation of the First Amendment, since the complaint as it now exists is insufficient. The facts alleged in the complaint and to which Saxe has stipulated, which may be read as having been alleged in the complaint because exhibits which could have been appended to the complaint support the stipulations, fail to support a First Amendment claim. Given that our factual recitation required some inference on our part, however, Saxe may disagree with those inferences. Any amended complaint should be specific in identifying those areas in which our recitation is inaccurate, at least in Saxe's view, and the factual allega-

tions must support a First Amendment claim.

As did the court in *Spohn,* however, we note that Saxe is not entitled to a display of his choosing nor to the inclusion of religious symbols in a secular display relating to the same holiday. We also emphasize the Third Circuit's admonition that any injunctive relief may not be fashioned so as to prevent SCASD from acting in a wholly constitutional manner.

An order consistent with this memorandum will issue.

## ORDER

For the reasons stated in the accompanying memorandum, **IT IS ORDERED THAT:**

1. The motion (record document no. 12) by defendants State College Area School District to dismiss the complaint is granted.

2. Plaintiff David Warren Saxe's motion (record document no. 39) for a preliminary injunction is denied as moot.

3. Saxe's response to "Defendants' Improperly Tendered Motion to Strike Exhibits" is construed as a motion to strike and is denied.

4. The complaint is dismissed insofar as it relates to Saxe's claims under 42 U.S.C. § 1983 and the First Amendment, designated Saxe's First Cause of Action and Saxe's Second Cause of Action in the complaint, without prejudice.

5. Saxe has leave to file an amended complaint consistent with this order and the accompanying memorandum within thirty (30) days from the date of this order.

6. Saxe may, at his option, file a notice of appeal from this order in lieu of an amended complaint, should he deem our factual recitation substantially accurate, or inaccurate but not to a degree which would affect disposition of the motion to dismiss.

---

**14.** Although not significant for present purposes, we note that Magistrate Judge Peck also dismissed the Title VII claim with prejudice. *Id.* at *4–5.

7. This order will become a final order and the clerk is directed to close the file (a) if and when Saxe files a notice of appeal or (b) if and when thirty days pass without the filing of an amended complaint or other document requiring action by the court, whichever first occurs.